**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

---

**THE BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE
CITY OF NEW YORK,**

*Plaintiff,*

v.

**Civil Action No. 26-cv-6584**

**UNITED STATES DEPARTMENT OF
EDUCATION, LINDA MCMAHON, in
her capacity as Secretary of the United
States Department of Education,
MURRAY BESSETTE, in his capacity as
Principal Deputy Assistant Secretary and
Acting Assistant Secretary of Education,
JENNIFER TODD, in her capacity as
Director of the Division of Family
Empowerment and Education Choice,
LAVANNA WEEMS, in her capacity as
Supervisory Management Program
Analyst,**

*Defendants.*

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, the Board of Education of the City School District of the City of New York,

operating as New York City Public Schools ("NYCPS"), by its attorney, Steven Banks,

Corporation Counsel of the City of New York, for its verified complaint against the United States

Department of Education (the "Department"); Linda McMahon, in her capacity as Secretary of the

United States Department of Education; Murray Bessette, in his capacity as Principal Deputy

Assistant Secretary and Acting Assistant Secretary of Education; Jennifer Todd, in her capacity as

Director of the Division of Family Empowerment and Education Choice; and Lavanna Weems, in

her capacity as Supervisory Management Program Analyst, alleges upon personal knowledge as to

itself and upon information and belief as to all other matters:

1

## I.    PRELIMINARY STATEMENT

1.    NYCPS brings this action seeking an order that the Department's Grant Award Notifications ("GANs") issued on June 9, 2026 to NYCPS in connection with the continuation of NYCPS' Magnet School Assistance Program ("MSAP") grants for the 2025-2026 budget year ("FY2026") be vacated and set aside—as arbitrary and capricious, and contrary to law, and as having been undertaken without observance of procedures required by law, and based on an interpretive rule which was not adopted by notice and comment rulemaking—and be replaced with new GANs for FY2026 reflecting a lawful, appropriate, full year funding determination reached according to, and in a manner consistent with, the statutes and regulations governing MSAP. It also seeks to preliminarily and permanently enjoin the Department, in issuing future GANs in connection with the NYCPS MSAP grants, from unlawfully defunding, or drastically reducing funding for, the grants, or  unlawfully imposing onerous or otherwise punitive conditions on the NYCPS' MSAP projects without valid basis and/or in a manner inconsistent with the statutes and regulations governing MSAP; and any other appropriate relief required to effectuate the lawful, appropriate, full year funding of the continued FY2026 NYCPS' MSAP grants.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1346. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704. The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

3.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because Defendants are an agency of the United States Government and officers sued in their official

capacities. Plaintiff is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred and are continuing to occur in this district.

### III.    PARTIES

4.      Plaintiff the Board of Education of the City School District of the City of New York, operating as New York City Public Schools, is the entity responsible for the governance, management, and oversight of New York City's public school district (the "City District"). The City District is a city school district created under the laws of the State of New York which operates more than 1600 schools in New York City. The City District encompasses 32 geography-based community school districts, as well as several specialized districts. Each community school district has a superintendent, and 11 additional superintendents lead groups of high schools. Almost one million students are enrolled in NYCPS, making it the largest school district in the United States.

5.      Defendant United States Department of Education is the agency of the federal government that establishes policy for, administers, and coordinates most federal assistance to education.  Among other responsibilities, the Department administers MSAP through its Office of Elementary and Secondary Education ("OESE") and enforces Title IX through the Office for Civil Rights.

6.      Linda McMahon is the Secretary of the Department of Education.  Secretary McMahon is named as a defendant in her official capacity.

7.      Murray Bessette is the Principal Deputy Assistant Secretary of Education and Acting Assistant Secretary, and serves as the principal adviser to the Secretary on policy development, implementation, evaluation, and review, and Department Grantmaking. He is also charged with determining and setting the appropriate amount of funding for a grant after a

continuation determination has been made. Principal Deputy Assistant Secretary Bessette is named as a defendant in his official capacity.

8.      Jennifer Todd is the Director of the Division of Family Empowerment and Education Choice, and oversees the management of a discretionary grant portfolio that includes the Magnet School Assistance Program. Todd is named as a defendant in her official capacity.

9.      Lavanna Weems, is a Supervisory Management Program Analyst at the Department, and the official who authorized and signed the Grant Award Notifications at issue in this action. Weems is named as a defendant in her official capacity.

## IV.    FACTUAL BACKGROUND

### A. <u>New York City Public Schools</u>

10.      NYCPS is an ethnically diverse school district. As of 2023-2024, student enrollment was 42.2% Hispanic, 19.5% Black, 18.7% Asian, 16.2% White, 1.8% multi-racial, and 1.2% Native American/Alaskan. Among our students, more than 180 languages are spoken. Additionally, in the 2023-2024 school year, 73.5% of NYCPS students were considered "economically disadvantaged," meaning—by reference to the federal poverty line—that they live in poverty, or are served by schools with high concentrations of students living in poverty.[1]

### B. <u>NYCPS Magnet Schools</u>

11.      Supported by federal law and policy, magnet schools developed in the 1970s as a voluntary desegregation tool and an alternative to mandatory busing as a remedy for segregated schools. They are defined under federal law as public elementary or secondary schools that offer "a special curriculum capable of attracting substantial numbers of students of different racial

---

[1] New York City Public Schools, NYCPS Data At A Glance (2025), publicly available at https://www.schools.nyc.gov/about-us/reports/nycps-data-at-a-glance

backgrounds." 20 U.S.C. 7231a. "Magnet" refers to the fact that students attending the school come from across normal attendance boundaries.

12.     As contemplated by this federal law and policy, many NYCPS students live in mono-ethnic and -socio-economic neighborhoods and attend NYCPS schools with similar demographics. NYCPS's development and expansion of magnet schools is a powerful tool in combatting this racial and socio-economic segregation in the City District.

13.     NYCPS currently operates over 200 magnet schools, many of which were initially established using federal seed funding provided by the Department through the federal Magnet School Assistance Program, with the expectation that once federal funding expired, the schools would continue to operate as self-sustaining magnet schools offering thematic programming.

## C. Magnet School Assistance Program (MSAP) Grants

### 1. The Purpose and Requirements of MSAP Grants

14.     MSAP is a federal grant program authorized by statute and administered by the Department through the Office of Elementary and Secondary Education. *See* 20 U.S.C. §§ 7231-7231j.  MSAP provides grants to eligible local educational agencies ("LEAs") and groups, or "consortia" of LEAs to establish and operate magnet schools under mandatory desegregation plans or voluntary efforts designed to bring students from different social, ethnic, and racial backgrounds together.  *See*  20 U.S.C. §§ 7231-7231j. In establishing MSAP, Congress made findings as to the significance and multiple educational and societal benefits of magnet schools, and expressly recognized them as being in the best interests of the United States:

> . . .
> (4) It is in the best interests of the United States—
>         (A) to continue the Federal Government's support of local educational agencies that are implementing court-ordered desegregation plans and local educational agencies that are voluntarily seeking to foster meaningful interaction among students of different racial and ethnic backgrounds, beginning at the earliest stage of such students' education;

(B) to ensure that all students have equitable access to a high quality education that will prepare all students to function well in a technologically oriented and a highly competitive economy comprised of people from many different racial and ethnic backgrounds; and

(C) to continue to desegregate and diversify schools by supporting magnet schools, recognizing that segregation exists between minority and nonminority students as well as among students of different minority groups.

(5) Desegregation efforts through magnet school programs are a significant part of our Nation's effort to achieve voluntary desegregation in schools and help to ensure equal educational opportunities for all students.

20 U.S.C. § 7231(a).

15.    MSAP grants financially support, *inter alia*, (1) the elimination, reduction, and prevention of minority group isolation in elementary and secondary schools with substantial numbers of minority group students; (2) the development, implementation, and expansion of magnet school programs designed to meet challenging state standards; (3) the development, design, and expansion of innovative educational methods and practices that promote diversity and choice in public school education; (4) courses of instruction that will substantially strengthen students' attainment of tangible and marketable career, technological and professional skills; (5) the capacity of LEAs to continue operating magnet schools at high level after the conclusion of the period of federal funding; and (6) equitable access to high quality education that will enable students to continue with postsecondary education or employment.  20 U.S.C. § 7231(b); 34 C.F.R. § 280.1.

16.    In its current iteration, MSAP provides for annual awards of up to $3.5 million per LEA or consortium of LEAs, for a project period of up to 5 years. Initially, MSAP grants were provided for 2-year periods, a limit that was later extended to 3 years, before 2015, when the 5-year period was adopted as part of Congress' passage of the Every Student Succeeds Act,[2] providing a longer incubation period for the creation of sustainable magnet programs.

---

[2] The Every Student Succeeds Act (ESSA), Public Law 114-95 (December 10, 2015) amended 20 U.S.C. § 7231h to extend the maximum length of MSAP grants to 5 years from 3.

17.     Among other requirements, MSAP projects must "be operated in a manner consistent with discrimination requirements contained in Federal civil rights laws." 87 Fed. Reg. 9591 (Feb. 22, 2022). Thus, as part of the application process for an MSAP grant, an eligible LEA or consortium of LEAs must provide the Department assurances that it will not engage in discrimination based on race, religion, color, national origin, sex, or disability in, *inter alia*, assigning students to schools or course of instruction or designing or operating extracurricular activities for students. 20 U.S.C. § 7231d(b)(2)(C)(ii), (iii). And the authorizing statute for MSAP provides that "[n]o grant shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights determines that the assurances described in subsection (b)(2)(C) will be met." 20 U.S.C. § 7231d(c).

18.     The Assistant Secretary of Education for Civil Rights ("Assistant Secretary") is the head of the Department's Office for Civil Rights, which is the office charged with enforcement of Federal civil rights laws that prohibit discrimination in Department programs, or activities that receive Federal funds from the Department, including Title IX. *See* 20 U.S.C. § 1681; 34 C.F.R. § 106 *et seq.*; 34 C.F.R. § 100.7.

### 2. *The Operation of Multi-Year MSAP Grants*

19.     The General Education Provisions Act, 20 U.S.C. §§ 1221 *et seq.* ("GEPA"), and the Department's own financial assistance regulatory framework, govern the Department's administration of multi-year MSAP funds. The Department's financial assistance regulations, 34 C.F.R. § 75 *et seq.*, address (1) the Department's competitive grantmaking selection process for new grants; and (2) its determination whether to continue a grantee's multi-year project–a process that does not involve competition with other grantees—and if continued, the awarding of funding. *Id.* §§ 75.215-227; 75.253. In addition, the MSAP regulations provide that grants are governed by Title 2 of the Code of Federal Regulations. *Id.* § 280.3. GEPA requires that rules

affecting the Department's provision of financial assistance go through the APA's notice and comment process. *See* 20 U.S.C. §§ 1221e-4, 1232; 5 U.S.C. § 553.

20.     When the Department announces a competition for new grants, it publishes an application notice ("Notice Inviting Applications") in the Federal Register that explains, among other things, the relevant selection criteria, and whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved. The Department scores the quality of each application using the selection criteria and competitive priorities, ranks the applications, and selects applications for new grants in rank order. 34 C.F.R. § 75.217; U.S. Department of Education, Discretionary Grantmaking at ED (Oct. 2024) ("Discretionary Grantmaking")[3] at 26-27.

21.     The procedures governing the Department's decision whether to *continue* multi-year grants are quite different. *See Discretionary Grantmaking* at 31–32. When awarding multi-year projects, the Department funds the initial budget period (usually 12-months) and "indicates [its] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(a)-(b).

22.     At the end of the annual budget period, when the time comes for a multi-year grant to be continued, the Department reviews information relevant to the grantee's performance for the prior year, including performance reports, performance measures, and financial data. *See* 34 C.F.R. §§ 75.118, 75.253(b); *Discretionary Grantmaking* at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); 59 Fed. Reg. 30259 (June 10, 1994).

---

[3] Publicly available at https://www.ed.gov/media/document/grantmaking-ed-108713.pdf.

23.    34 C.F.R. § 75.253(a) provides that in order to receive a continuation award after the first budget period of a multi-year grant, the grantee must, *inter alia*, demonstrate substantial progress in achieving the goals and objectives of the project, submit all required performance reports, continue to meet all eligibility requirements of the program, and "receive a determination from the Secretary that continuation of the project is in the best interests of the Federal Government." In making a continuation award, the Secretary "also considers whether the grantee is operating in compliance with the assurances in its approved application, including those applicable to Federal civil rights laws that prohibit discrimination in programs or activities receiving Federal financial assistance from the Department." *See* 87 Fed. Reg. 9595 (Feb. 22, 2022); 88 Fed. Reg. 15705 (March 14, 2023).

24.    The Department has long represented that a cut-off in continuation award funding is "extremely rare in practice." 59 Fed. Reg. 30259 (June 10, 1994). More recently, the Department explained that "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." 89 Fed. Reg. 70,316 (Aug. 29, 2024).

25.    Where the Department decides not to continue a multi-year grant, the Secretary must notify the grantee of that decision, the grounds on which it is based and, "consistent with 2 CFR 200.342,[4] provide the grantee with an opportunity to request reconsideration of the decision." 34 CFR § 75.253(g).[5]

---

[4] 2 CFR § 200.342 provides that "[u]pon initiating a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action."

[5] To the extent the Department effectuates a termination of an MSAP grant, the requirements of 2 C.F.R. Part 200 governing the whole or partial termination of a federal award for non-compliance would apply, requiring the Department to make a determination that any alleged non-compliance cannot be remedied by imposing additional conditions, as required by 2 C.F.R. § 280.339, and requiring notice and an opportunity to object to and provide information and documentation challenging the termination action. 2 C.F.R. §§ 200.340–42.

9

26.     Finally, where a grant is not continued, the Secretary may authorize a no-cost extension of the last budget period in order "to provide for an orderly closeout of the grant." 34 CFR § 75.253(h). A no-cost extension is an extension of the period of performance for a grant that would not require the obligation of additional Federal funds but would permit a grantee to spend available unobligated funds remaining beyond the original grant performance period. *See* 2 CFR § 200.308(f)(10).

**D.  NYCPS's MSAP Grants**

27.     NYCPS has been a recipient of MSAP grants for its magnet schools since at least 2010. Between 2010 and 2022, 63 different NYCPS magnet schools have been funded under MSAP. During the continuation years of each of the MSAP grants awarded to NYCPS during those periods, NYCPS' magnet school projects were found to be in the "best interests of the Federal Government" pursuant to 34 C.F.R. § 75.253(a), and NYCPS MSAP projects' assurances of compliance with federal civil rights were routinely certified pursuant to 20 U.S.C. § 7231d(c), or considered to be operating in compliance with the assurances in its approved application, ***without exception***.[6] Moreover, without fail, each MSAP Project received a new grant award each year sufficient to support the operation of its magnet schools for the entirety of the applicable twelve month budget period.

28.     On February 22, 2022, the Department published in the Federal Register a Notice Inviting Applications ("NIA") for Fiscal Year 2022 ("FY2022") from LEAs or consortia of LEA's for MSAP grants of up to $3.5 million per budget year, for a project period of up to 5 years, to create or revise magnet schools. 87 Fed. Reg. 9587 (Feb. 22, 2022). NYCPS applied for

---

[6] Notably, as discussed herein, during part or all of every single one of those past MSAP project periods except the very first one (2010-2013), NYCPS had in place a version of what is currently known as its Guidelines to Support Transgender and Gender Expansive Students.

MSAP grants in response to the FY2022 NIA through three new inter-district magnet school projects, each involving two community school districts ("CSD"): (1) Brooklyn Inter-District (CSD 32 and 16); (2) Brooklyn and Queens Inter-District (CSD 19 and 27); and (3) Queens Inter-District (CSD 28 and 29) (together, the "FY2022 MSAP Projects").

29.    The FY2022 MSAP Projects involved transforming 13 schools—8 primary schools, and 5 middle or intermediate schools—located in Brooklyn and Queens into new magnet schools serving students from pre-kindergarten and/or kindergarten through 5th grade (for primary schools), and sixth through eighth grades (for middle or intermediate schools). The FY2022 MSAP Projects have launched schools with diverse programmatic focuses including journalism and multimedia;[7] innovative leadership and civic activism;[8] multimedia arts and engineering;[9] discovery and applied learning;[10] leadership and exploration;[11] multimedia and the performing arts;[12] and leadership through engineering.[13]

30.    On March 14, 2023, the Department published in the Federal Register an NIA for Fiscal Year 2023 ("FY2023") inviting applications from LEAs or consortia of LEAs for MSAP grants of up to $3.5 million per budget year, for a project period of up to 5 years to create or revise magnet schools. 88 Fed. Reg. 15697 (March 14, 2023). NYCPS applied for MSAP grants in response to the FY2023 NIA through two new inter-district magnet school projects, each involving three CSDs: (1) Bronx Inter-District (CSD 7, 10, and 11); and (2) Manhattan Inter-District (CSD 4, 2, and 6) (together, the "FY2023 MSAP Projects").

---

[7] PS 202, The Magnet School of Journalism and Multimedia
[8] PS 312, The Jamaica Children's Magnet School for Innovative Leadership and Civic Activism
[9] VSCMS, The Magnet School of Multimedia Arts and Engineering
[10] PS 182, The Samantha Smith Magnet School for Discovery and Applied Learning
[11] MS 332, The Redwood Magnet School for Leadership and Exploration
[12] MS 72, The Catherine and Count Basie Magnet School of Multimedia and the Arts
[13] PS 145, The Magnet School of Leadership Through Engineering

31.    The two FY2023 MSAP Projects involved transforming six high schools located in Manhattan and the Bronx into new magnet schools serving students in grades 6-12 with programmatic focuses on, among other things, STEAM;[14] early college exploration;[15] career connected learning;[16] aspiring educators;[17] and innovation through visual arts[18].

32.    As part of the MSAP grant applications in both FY2022 and FY2023, each CSD member of the MSAP Projects provided the Department with a signed assurance of compliance with federal civil rights law, a prerequisite for NYCPS' eligibility to receive this MSAP grant funding.

33.    By the issuance of three Grant Award Notifications in FY2022, and two Grant Award Notifications in FY2023, the Department announced 5-year MSAP grants of $2,999,999 per year were being awarded to each of the MSAP Projects on or about September 30, 2022 and September 30, 2023, respectively, for an expected total award of almost $15 million per Project over each grant's 5-year project performance period. For the FY2022 MSAP Projects, the performance period was from October 1, 2022 through September 30, 2027. For the FY2023 MSAP Projects, the performance period was from October 1, 2023 through September 30, 2028.

34.    In each case, in awarding MSAP grants, the Department determined that the grants were in the best interests of the Federal Government, and—through OCR—certified the assurances by the NYCPS MSAP applicants that they comply with federal civil rights law. At the time that the Department made those determinations and certifications, the NYCPS Guidelines to support transgender and gender expansive students in NYCPS—discussed at ¶ 47, *infra*—were in place.

---

[14] Jacqueline Kennedy Onassis STEAM Magnet School of Business Careers
[15] Esperanza Early College Exploration and Leadership Magnet
[16] Magnet School of Career Connected Learning
[17] Magnet School for Aspiring 21st Century Educators and Leaders
[18] Magnet High School for Innovation through Visual Arts

35.    Since the time when the FY2022 and FY2023 MSAP Projects began, on October 1, 2022 and October 1, 2023, respectively, without exception, they each received MSAP funding for an initial budget period of one year, and for annual continuation budget periods. In connection with each continuation of the MSAP grants, the MSAP Projects submitted the Spring annual performance reports required by 34 C.F.R. § 75.118 to the Department, and the Department determined that the grants were in the best interests of the Federal Government, and—through OCR—certified the assurances by the applicants that they comply with federal civil rights law.[19] At the time that the Department made those determinations and certifications, the NYCPS Guidelines to support transgender and gender expansive students in NYCPS were in place.

36.    Since their initial budget periods in October of 2022 and 2023, respectively, the NYCPS MSAP Projects have made use of the MSAP grant funds to successfully design, develop, and launch the initial phases of innovative magnet school programs at the 19 funded magnet schools, with the expectation that they would be given the full 5 years of funding that Congress intended, and that each year, they would receive new grant funding sufficient to support the full year of planned programming, in order to position their schools to successfully transition into self-sustaining magnet schools.  Using each new annual award of MSAP funding, FY2022 MSAP Project Schools have established a student-led broadcasting station,[20] created specialty learning spaces including a podcasting lab and a STEAM lab,[21] hired full-time engineering/STEM instructors,[22] developed an active student newspaper and morning news

---

[19] While the Department issued such "certifications" every year, in fact, the certification requirement only applies to applications for new grants. In continuation years, the Department need only "consider[] whether the grantee is operating in compliance with the assurances in its approved application, including those applicable to Federal civil rights laws…." 87 Fed. Reg. 9595 (Feb. 22, 2022); 88 Fed. Reg. 15705 (March 14, 2023).

[20]  PS 86, Bushwick Magnet Multimedia and Arts Academy

[21] PS 116, Leadership Through Multimedia and the Arts Magnet School

[22] PS 145, The Magnet School of Leadership Through Engineering

station,[23] begun to establish a state-of-the-art fabrication lab and recording studio,[24] and created a puppet-making residency.[25]

37.     Using each new annual award of MSAP funding, FY2023 MSAP Project Schools have begun implementing early college courses with a local college,[26] established Advanced Placement classes and a dual enrollment option with a local college,[27] developed a financial technology lab with a financial literacy curriculum,[28] facilitated an entirely student-designed and produced full scale musical production,[29] launched a student-led social media team providing students with hands-on experience in graphic design, digital storytelling, and strategic communication,[30] and developed a design lab.[31]

38.     And many of the schools have already achieved notable success. For example, only 3 years after the launch of the FY2022 MSAP Project, NYCPS' MSAP-funded Schools were recognized with a Magnet Schools of America Top Magnet School of Excellence Award,[32] and magnet school students were crowned District debate champions,[33] and achieved remarkable improvements in English and math proficiency.[34]

39.     As Congress intended, NYCPS' 5-year plans for the FY2022 MSAP Project magnet Schools were focused on using the new annual grant funding received in remaining budget periods to ensure that the magnet Schools become self-sustaining after September 30,

---

[23] PS 202, The Magnet School of Journalism and Multimedia
[24] VSCMS, The Magnet School of Multimedia Arts and Engineering
[25] PS 135, The Bellaire Magnet School of Exploration Through the Arts
[26]  Esperanza Early College Exploration and Leadership Magnet
[27] Jacqueline Kennedy Onassis STEAM Magnet School for Business Careers
[28] *Id*.
[29] City College Magnet School of the Arts
[30] Magnet High School for Innovation Through Visual Arts
[31] *Id.*
[32] MS 35, The Magnet School of Leadership, Exploration, and the Arts
[33] PS 182, The Samantha Smith Magnet School for Discovery and Applied Learning
[34] The percentage of students achieving proficiency in Math and English at the Bushwick Magnet Multimedia and the Arts Academy had improved by 24.7 and 20.6 percentage points, respectively. The Magnet School of Leadership and Innovation improved its math proficiency by 24.9 percentage points, and The Magnet School of Multimedia Arts and Engineering improved its by 29.7 percentage points.

2027 when the FY2022 MSAP Projects' funding period was scheduled to expire. For example, one of the Schools had planned to purchase a SmartTable Collaborative Learning Center in budget year 4, and an A+ STEM Law Robotic Technology Kit in year 5.[35] Another had budgeted to purchase a Phase IV of a Multimedia Lab Production Package, having purchased Phases I, II, and III during its first 3 years.[36] [37]

40.    NYCPS' 5-year plans for the FY2023 MSAP Schools, which are a year less established, were created to use the new grant funding received each year to ensure that the Schools become self-sustaining by September 30, 2028 when the FY2023 MSAP Projects funding period was scheduled to expire. With only 2 fully funded years provided as of September 30, 2025, these Projects were only just getting underway and had planned to invest considerable resources to develop partnerships, and design the experiences, core practices, systems and structures necessary to ensure sustainability.

41.    Because of the timing of initial MSAP grant approvals, and initial funding, which operate on the federal fiscal schedule, not the school calendar, it is typical that projects receiving MSAP grant funding are not able to begin spending the grant funds received during the initial budget year until well into the school year because at the time the funding is awarded, they are not yet operating as magnet schools, and primarily spend funds planning for the upcoming first school year operating as magnet schools. This inevitably results in a substantial portion of the first-year grant amount not being expended during the designated "year 1" budget period. This likelihood is recognized in the federal program regulations, which provide that unspent amounts from one budget year become "carryover" which may be spent in the following budget year.

---

[35] PS 116, Leadership Through Multimedia and the Arts Magnet School
[36] MS 35, The Magnet School of Leadership, Exploration, and the Arts
[37] As a result of the non-continuation of the grants, and the related interim agreement which restricted NYCPS to carryover funding through June 30, 2026, *see, infra*, ¶¶ 70-71, none of these expenditures could be made.

Carryover from one budget year to the next typically recurs (and gradually increases in size) during the successive budget years of the MSAP grant.

42.     As set forth at 34 CFR 75.253(d), "a grantee may expend funds that have not been obligated at the end of a budget period for obligations of the subsequent budget period" and NYCPS MSAP projects have done so in prior years, "if the obligation is for an allowable cost that falls within the scope and objectives of the project." As long as a grant is continued from one budget period to the next, any carryover funds from the prior budget period will be available to the grantee to be spent in the subsequent budget period. As of September 2025, the combined FY2025 unspent funds that were available for carryover for use by the five NYCPS MSAP Projects was approximately $11 million. *See also*, 34 CFR § 75.253(e).

43.     In May of 2025, each of the MSAP Projects timely submitted a Spring annual performance report to the Department, in which it documented its progress towards the Project goals, provided a financial update, and submitted the required assurances of compliance with federal civil rights law. Each also documented in the report the amount of unspent funds it was seeking to carry over into the next budget period, and submitted a budget documenting the ways in which the carryover funds would be used in the next budget period for allowable costs falling within the scope and objectives of the Project.

E.  **Federal, State and Local Laws Prohibiting Discrimination on the Basis of Gender Identity Before and After January 2025, When the Department Purported to Adopt a Novel Interpretation of Title IX**

44.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), prohibits discrimination based on sex in federally funded education institutions. In 2021, the Department published interpretive guidance in the Federal Register stating that its Office of Civil Rights would "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." U.S. Department of Education, Enforcement of Title IX of the Education Amendments

16

of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 2021 (the "Title IX Interpretive Guidance").[38]

45.     The Title IX Interpretive Guidance's stated purpose was "to clarify the Department's enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX." According to the Guidance, "OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department," such that OCR will read Title IX to protect an individual who is "harassed, disciplined in a discriminatory manner, excluded from, denied equal access to, or subjected to sex stereotyping in academic or extracurricular opportunities and other education programs or activities, denied the benefits of such programs or activities, or otherwise treated differently because of their sexual orientation or gender identity."[39]

46.     In New York, the law relevant to gender identity-based discrimination is clear: it is unlawful to discriminate against people on the basis of their gender identity or gender expression. New York's Constitution states that "[n]o person shall be denied the equal protection of the laws of this state" and prohibits discrimination because of "sex, including sexual orientation, gender identity, [or] gender expression." N.Y. Const. art. I, § 11(a). The same protections apply in the education context.[40] Moreover, New York law mandates that "the board of education and the trustees or sole trustee of every school district *shall* create policies, procedures and guidelines that shall include, but not be limited to "policies and procedures

---

[38] 86 Fed. Reg. 32637 (June 22, 2021).
[39] *Id.* at 32639.
[40] New York prohibits discrimination or harassment against students on the basis of sexual orientation or gender, and here again, gender means "actual or perceived sex and shall include a person's gender identity or expression." N.Y. Educ. Law §§ 11-12.

17

intended to create a school environment that is free from harassment, bullying and discrimination…." N.Y. Educ. Law § 13 (emphasis added).

47.    Consistent with the Title IX Interpretive Guidance, and judicial interpretation of Title IX, and in compliance with New York state law, NYCPS maintains policies for its school-based and central staff that support transgender and gender expansive students. NYCPS' current *Guidelines to Support Transgender and Gender Expansive Students*[41] have been in place since 2019, however prior versions go back as far as 2014. The NYCPS Guidelines set out a protocol and best practices for records, names and pronouns, curriculum, and resources, as well as access to restrooms, locker rooms, sports and physical education, and other circumstances. As required under New York law, the NYCPS Guidelines state that students must be given access to facilities and permitted to participate in all school activities in accordance with their gender identity asserted at school. The NYCPS Guidelines also reflect a commitment to ensure a safe learning environment for all students free from discrimination and harassment.

48.    Notwithstanding the Department's published interpretation of Title IX, in January 2025, President Trump issued three Executive Orders rejecting the Department's Title IX Interpretive Guidance, purporting to announce a new federal interpretation of Title IX, and ordering agencies to adopt and enforce it (the "Gender Ideology EOs").[42] [43]

49.    The Gender Ideology EOs impose an interpretation of Title IX that rejects "gender identity-based access to single-sex spaces" including "use of intimate facilities and

---

[41] NYCPS, *Guidelines to Support Transgender and Gender Expansive Students*, publicly available at https://www.schools.nyc.gov/school-life/school-environment/guidelines-on-gender/guidelines-to-support-transgender-and-gender-expansive-students.

[42] *See* Executive Order ("EO") 14168 – *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025); EO14190 – *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); and EO 14201 – *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).

[43] EO 14168 went so far as to direct Agency heads to "promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner," including the Title IX Interpretive Guidance. EO 14168 at § 7(c)

18

accommodations such as bathrooms or locker rooms specifically designed for persons of the opposite sex; and participating in school athletic competitions or other extracurricular activities specifically designed for persons of the opposite sex." EO 14168 § 3(f); EO 14190 § 2(e). According to the Gender Ideology EOs, the new interpretation would be enforced by "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology," and "prevent[ing] or rescind[ing] Federal funds … from being used by an … elementary school, or secondary school, to directly or indirectly … support or subsidize a violation of Title VI or Title IX." EO 14190 at § 3(iv)(B).

50.     The Gender Ideology EOs also heralded the January 2025 District Court decision in *Tennessee v. Cardona*, 762 F. Supp. 615, 627-628 (E.D. Ky. 2025), in which a District Court in Kentucky vacated a 2024 Final Rule issued after notice and comment by the Department under President Biden[44] that had, *inter alia*, codified the Department's understanding that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

51.     On February 4, 2025, OCR issued a Dear Colleague Letter ("DCL") purporting to announce a pivot in the federal government's enforcement of Title IX, consistent with EO 14168, in which "President Trump ordered all agencies and departments within the Executive Branch to 'enforce all sex-protective laws to promote [the] reality' that there are 'two sexes, male and female,' and that '[t]hese sexes are not changeable….'"[45] The DCL announced: "ED and OCR must enforce Title IX consistent with President Trump's Order."[46]

---

[44] 89 Fed. Reg. 33474(Apr. 29, 2024).
[45] Craig Trainor (Feb. 4, 2025), Dear Colleague Letter, Washington, D.C.: U.S. Department of Education, Office for Civil Rights, publicly available at https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl-109477.pdf.
[46] *Id.*

52.    Notwithstanding the purpose and content of the Gender Ideology EOs and the DCL, the Department has neither revoked the Title IX Interpretive Guidance, nor replaced it by publishing a revised interpretation in the Federal Register. Rather than lawfully promulgating a revised interpretation, with a prescribed notice and comment period, the Department instead purported to adopt a new policy governing continuation determinations for discretionary grants. On June 5, 2025, the Department, through Murray Bessette, a Senior Advisor purportedly "Delegated the Authority to Perform the Function and Duties of the Assistant Secretary for the Office of Planning, Evaluation and Policy Development," issued the "Non-Competing Continuation Discretionary Grant Award Review Policy," ("USDE Grant Continuation Policy"), which purports to "provide guidance" regarding "the review criteria" … "to be used in considering non-competing continuation (NCC) awards in discretionary grant portfolios and no cost extensions."[47]

53.    Far from being *guidance*, the USDE Grant Continuation Policy expressly mandates, *inter alia*, that each discretionary grant award "shall" be reviewed "to ensure that grant funds are not supporting any discriminatory activities, such as" … "[a]llowing males into female-only sports," and "[a]llowing males into female intimate spaces (e.g. bathrooms, locker rooms)," that "[p]rogram offices shall flag for further review any project that includes any activities, such as those listed above, that violate … Title IX," and that "[p]rogram office leadership will then make a recommendation for continuation or non-continuation to [the Office of Planning, Evaluation, and Policy Development]," who will make a decision taking "appropriate action, which may include non-continuation of the grant."[48]

---

[47] *State of California, et al. v. U.S. Department of Education, et al.,* 25-cv-10548 (D. Mass.), ECF Dkt 155-1 at 2 (page citations are to the page number on the docket header).
[48] *Id.* at 2-3.

**F.  OCR's Title IX-Based Discontinuation of NYCPS's MSAP Grants**

54.    In or around September 2025, the Department announced that it was discontinuing NYCPS' MSAP grants effective September 30, 2025, and effectuated this decision by four separate actions: (1) OCR's refusal to certify NYCPS' compliance with federal civil rights law pursuant to 20 U.S.C. § 7231d(c), communicated in a letter dated September 16, 2025; (2) the non-continuation decision—communicated both initially, in the September 16, 2025 letter, and upon reconsideration, in a letter dated September 26, 2025—pursuant to 34 CFR 75.253(a)(5); (3) the resetting of the project performance period to September 30, 2025 made effective by the issuance of revised Grant Award Notifications on September 30, 2025; and (4) the election not to authorize a no-cost extension to facilitate orderly closeout of the grants, which was communicated first in the September 26, 2025 letter, and affirmed in the subsequent Grant Award Notifications (together, the "Discontinuation").

*1.  The September 16, 2025 Notice of Discontinuation*

55.    On September 16, 2025, Acting Assistant Secretary Craig W. Trainor sent a letter notifying NYCPS that OCR "has identified a civil rights compliance issue" with NYCPS due to the NYCPS Guidelines (the "OCR Discontinuation Letter"). This notice arrived more than two weeks into the 2025-2026 school year for the 19 covered magnet Schools, where approximately 7700 students were attending school and countless other employees were working to foster and support the students' education, including, for each MSAP Project, a Project Director who is led and supported by NYCPS' Director of Magnet Schools Assistance Program, specialized teachers trained to deliver innovative curriculum, and onsite coaches charged with building the Schools' capacity to continue operating as a magnet school.

56.    The OCR Discontinuation Letter announced a finding by OCR that the District-wide NYCPS Guidelines discriminate on the basis of sex in violation of Title IX in that (1)

21

NYCPS permits students to use restrooms and locker rooms consistent with their gender identity; (2) students are permitted to participate in all school activities, including sports and overnight field trips, in accordance with their gender identity, with privacy concerns to be addressed on a case-by-case basis; and (3) transgender or gender expansive students may not be required to use an alternative facility, such as a single-occupancy restroom, or a facility that conflicts with their gender identity.

57.    On the basis of that purported finding, which was made without notice, investigation, hearing, or opportunity to contest, the Acting Assistant Secretary refused to certify for the FY2026 grant continuation period, stating that NYCPS cannot meet its civil rights assurances, as required by 20 U.S.C. § 7231d(c), and that NYCPS's MSAP grant would be non-continued under 34 C.F.R. § 75.253(a)(5) because "it is no longer in the best interest of the Federal Government." (*See* OCR Discontinuation Letter).

58.    In announcing the non-continuation of NYCPS' MSAP grant, the letter did not purport to make any findings, nor identify any concerns, about NYCPS' performance reports, performance measures, or financial data for the prior year. *See* 34 C.F.R. §§ 75.118, 75.253(b); *Discretionary Grantmaking* at 32.

59.    Likewise, the letter did not provide any performance-related explanation as to why the MSAP grants were "no longer in the best interest" of the Federal Government, whether by reference to the purpose of MSAP—including the Congressional findings that continuing to fund MSAP projects is in the best interests of the United States—or by offering any other explanation.

60.    Instead, OCR simply demanded that NYCPS *agree to take* "remedial measures," and indicated that NYCPS could request reconsideration of the decision, but *only* if NYCPS notified OCR in writing by 5 p.m. ET on Friday, September 19, 2025—within three business

days—that it would agree to take the following "remedial steps," outlined in the letter, to ensure

its compliance with Title IX:

1. Adopt biology-based definitions for the words 'male' and 'female' pursuant to Title IX;
2. Issue a public statement to parents, students, and staff stating that New York City Public Schools will comply with Title IX and specifying that it will not allow males to compete in female athletic programs or occupy intimate facilities designated for females;
3. Specify that New York City Public Schools must provide intimate facilities such as locker rooms and bathrooms accessible to its students strictly separated on the basis of sex and comparably provided to each sex;
4. Specify that New York City Public Schools must provide sleeping arrangements during overnight activities and athletic trips to its students strictly separated on the basis of sex and comparably provided to each sex;
5. Specify that Title IX forbids schools from allowing boys or men to participate in any athletic program designated for girls or women, ensuring that only female students are eligible to join, participate, or be categorized or counted as a member of Girls' Team(s)/Category(s) and that all male students are ineligible to join, participate, or be categorized or counted as a member of Girls' Team(s)/Category(s); and
6. Rescind any guidance that violates Title IX, remove or revise any internal and public-facing statements or documents that are inconsistent with Title IX, and notify all parents, students, and staff of such rescissions and revisions.

(OCR Discontinuance Letter, pp. 3-4.)

61.    On September 19, 2025, prior to the expiry of OCR's three-day deadline, NYCPS

General Counsel Liz Vladeck responded to the OCR Discontinuation Letter on behalf of the

NYCPS Chancellor by requesting a 30-day extension of the deadline to consider whether to seek

reconsideration of OCR's decision, given that it would be unreasonable to expect NYCPS to

evaluate the implications of the OCR Discontinuation Letter and its impact on schools,

programs, and students within three business days (the "NYCPS Request for Extension"). The

NYCPS Request for Extension also sought responses to a series of questions to assist NYCPS in

evaluating its options.

23

62.    In particular, NYCPS raised the following inquiries:

- Please explain why the Secretary, in summarily concluding that NYCDOE is in violation of Title IX, has deprived the NYCDOE of the procedures and due process required by federal regulations before discontinuing funding based on alleged non-compliance.
- Please explain the nexus between your interpretation of Title IX and the MSAP grant funding that is being discontinued. The policies that you cite are not specific to the MSAP and your letter does not provide a basis for targeting MSAP grants. Nor is it clear how OCR's interpretation of Title IX impacts the goals of the MSAP to expand access and educational opportunities for underserved communities.
- Public statements suggest that only three school districts nationally have been sent letters advising that MSAP grants are being discontinued. Please explain the basis for selecting these three districts.
- Please confirm that MSAP grant funding already authorized for Fiscal Year 25, but not yet spent, may be used as carryover for expenditures made in Fiscal Year 26 for the five Magnet School Programs.
- Please provide us with a copy of the OCR's written procedures for processing objections, hearings and appeals, as required by 34 C.F.R. 200.342.

(*See* NYCPS Request for Extension pp. 1-2.)

63.    Assistant Secretary Trainor replied to the NYCPS Request for Extension via a short email on September 20, 2025 (the "Trainor Email"). The Trainor Email rejected NYCPS' request for an extension, and refused to provide the requested information, stating that "the authorities cited [in the Discontinuation Letter] speak for themselves." (*Id.*) He granted NYCPS two additional business days—until 5:00 p.m. ET on Tuesday, September 23, 2025—to *seek reconsideration by implementing the remedial measures* outlined in the Discontinuance Letter, threatening that "[f]ailure to do so will result in a denial of reconsideration, and my decision not to certify NYC DOE's grant under 20 U.S.C. § 7231d(c) and non-continue its MSAP grant under 34 C.F.R. § 75.253(a)(5) will stand." (*Id.*)

24

## 2. The September 26, 2025 Denial of Reconsideration

64. On Friday, September 26, 2025, the Department, through Lindsey Burke, its Deputy Chief of Staff for Policy and Programs, wrote to NYCPS Chancellor Melissa Aviles-Ramos purporting to deny a request for reconsideration of the non-continuation decision that NYCPS never actually made (the "Burke Letter").

65. The Burke Letter concluded that based on the same "ongoing civil rights concerns" upon which the Assistant Secretary refused to certify *NYCPS' compliance* with civil rights laws, reconsideration of the "best interests" determination was denied. *Id.* Similar to the OCR Discontinuation Letter, in the Burke Letter, the Department again did not consider, let alone make any findings, or identify any concerns, about NYCPS' performance reports, performance measures, or financial data for the prior grant year. *See* 34 C.F.R. §§ 75.118, 75.253(b); Discretionary Grantmaking at 32. The Burke Letter also made no reference to the purpose of MSAP—including the Congressional findings that continuing to fund MSAP projects is in the best interests of the United States.

66. Finally, the Burke Letter informed NYCPS for the first time that "the Department is electing … not to authorize further no-cost extensions for [NYCPS' MSAP] grant awards identified for non-continuation." *Id.*

## 3. The Revised Grant Award Notifications

67. On Monday, September 29, 2025—three weeks into the 2025-2026 school year—without any prior notice, the Department issued to NYCPS new Grant Award Notifications for each of the five MSAP Projects, resetting the project performance periods for each MSAP grant to end on September 30, 2025, and revising the authorized funding for each MSAP grant to the amount expended on the Project through September 30, 2025. In so doing,

the Department barred NYCPS' MSAP Projects from carrying over into FY2026 approximately $11 million in unspent funds across all of the 5 MSAP Projects from FY2025.

## G. The First Action and the Motion for Summary Judgment

68.    On October 15, 2025, NYCPS filed a complaint asserting five claims under the Administrative Procedure Act (APA)—(1) agency action without observance of procedure required by Title IX; (2) agency action without observance of procedure required by GEPA, MSAP 2 C.F.R. § 200; (3) arbitrary and capricious agency action; (4) agency action without notice and comment rulemaking; and (5) agency action contrary to law—and seeking declaratory and injunctive relief to vacate and set aside the Discontinuation. *The Board of Education of the City School District of the City of New York v. United States Department of Education, et al.*, 25-cv-8547 (AS) (S.D.N.Y.) ("*NYCPS v. USDE*" or the "First Action").

### 1. *NYCPS' Preliminary Injunction Motion and the Parties' Consent Order in the First Action*

69.    NYCPS also moved for a preliminary injunction in the First Action, seeking interim relief to enable it to access the carryover funds. *NYCPS v. USDE,* 25-cv-08547, ECF Dkt 4, *see also Id.* at Dkt 8.

70.    By order dated November 12, 2025, the Court directed counsel for the Department to consult with their client on whether it would permit NYCPS to use non-expended funds from the prior budget year for the current budget year, during the pendency of the litigation. *NYCPS v. USDE,* 25-cv-08547*,* ECF Dkt 36.

71.    In a Consent Order dated November 19, 2025, which was so ordered by the Court on November 20, 2025, the parties agreed in the First Action that NYCPS could access and use its carryover funds for the period beginning October 1, 2025, and ending June 30, 2026, for all permissible expenses or obligations incurred under the grants up to and through June 30, 2026.

26

On that basis, NYCPS withdrew its motion for a preliminary injunction in the First Action, without prejudice, and the parties agreed to an expedited schedule for briefing on summary judgment. *NYCPS v.* USDE, 25-cv-08547, ECF Dkt 42.

2. ***NYCPS' Summary Judgment Motion and the April 8, 2026, Opinion and Order in the First Action***

72.    On December 16, 2025, NYCPS moved for summary judgment in the First Action as to each of its claims for relief. The Department opposed the motion and cross-moved for dismissal. The motions were fully briefed and submitted on February 20, 2026. *NYCPS v. USDE*, 25-cv-08547, ECF Dkt 52.

73.    On April 8, 2026, the Court granted summary judgment in in favor of NYCPS as to Count I of the Complaint and denied the Department's cross-motions to dismiss or for summary judgment (the "April 8 Order"). *NYCPS v. USDE,* 25-cv-08547, ECF Dkt 83. The Court held that the Department had non-continued the MSAP grants based on its finding that NYCPS had violated Title IX. The Court further held that, because the Department failed to follow the procedures required to non-continue the grants based on Title IX, they had acted "without observance of procedure required by law" under the APA, 5 U.S.C. § 706(2)(D). The Court did not reach any of the other four Counts pled in the First Action.

74.    Accordingly, the Court vacated the Department's non-continuation determinations with respect to the five MSAP grants; declared that Defendants had failed to follow the required Title IX procedures; permanently enjoined Defendants from non-continuing NYCPS' MSAP grants based on Title IX findings, or "civil rights violations" related to Title IX, without following Title IX procedures; and ordered Defendants "to make a continuation determination with respect to each of NYCPS' MSAP grants within 10 days [of the Court's order]." *NYCPS v. USDE*, 25-cv-08547, Dkt 83 at 10.

**H.  Defendants' Failure to Comply with the April 8 Order**

75.     On April 17, 2026, the Department notified NYCPS through a "Notice of Continuation Determination" that each of the MSAP grants was being continued, and that each grant's performance period was being extended to September 30, 2026. Although the Notice stated that it was issuing a continuation determination "for your grant award" and that "your grant award is being continued from October 1, 2025 through September 30, 2026," the Notices did not include a grant award amount. Instead, they indicated that the Department "will request updated grant performance and financial information before making available further funding." On April 20, 2026,  the Department issued "zero dollar" GANs which extended the performance period for the grants to September 30, 2026, but did not provide the grant awards associated with the continuations.

76.     In letters dated April 22, 2026, the Department specified the information being requested: final performance and financial data for FY2025 (October 1, 2024-September 30, 2025) as well as an update on "implementation progress" for the first half of FY2026 (October 1, 2025-March 31, 2026)—the grant year for which no MSAP funding had yet been issued due, first, to the Discontinuation, and second, to the Department's failure to comply with the April 8 Order. The letters imposed a deadline of May 15, 2026 for NYCPS to submit the requested information.

77.     On May 1, 2026, by letter, NYCPS objected to the Department's failure to comply with the April 8 Order to make a continuation determination within 10 days and to its unilateral extension of the deadline—by virtue of the information requests—well beyond the Court's 10-day deadline. Nevertheless, and despite the irregularity of the requests, on May 1, 2026 NYCPS submitted final performance and budget information for FY2025, in an effort to expedite resolution. With this additional information for the 2024-2025 grant year, the

Department had in its possession more information than it typically has when making continuation awards. On May 15, 2026, NYCPS also submitted updated information for the first half of the current grant year, FY2026 (October 1, 2025-March 31, 2026)—the period during which it had not received any new grant funding—in accordance with the standard practice for grant continuation determinations, for consideration in connection with the subsequent grant year, FY2027 (October 1, 2026-September 30, 2027).

78.    On May 5, 2026, the Department rejected NYCPS' May 1, 2026 objection to the April 22, 2026 information requests, asserting that it was in compliance with the April 8 Order, which "required only that the Department of Education 'make a continuation determination'" and "did not prohibit the Department of Education from requesting updated financial or performance information … to assist in informing appropriate funding."

## I.    The June 4, 2026 Order and Defendants' Continued Failure to Comply

79.    On May 14, 2026, NYCPS filed a motion in the First Action seeking to enforce the April 8 Order by requiring that proper continuation determinations—which, because the determination made was to continue the grants, must necessarily include grant awards—be made within 5 days. The motion was heard on June 4, 2026. After hearing argument, the Court issued an opinion and order from the bench, followed by a written order on the docket, that granted NYCPS' motion to enforce "for the reasons stated on the record at the June 4, 2026, hearing" (the "June 4 Order"). *NYCPS v. USDE*, 25-cv-08547,ECF Dkt 104.

80.    The Court's June 4 Order determined that Defendants had failed to comply with the April 8 Order, and reiterated its prior holding that Defendants had forfeited any argument going to the scope of the injunction. Tr. of Arg, at 33-34. The Court further held that Defendants had failed to show any basis in the MSAP regulations for their position that they could comply with the April 8 Order by merely issuing a determination that the grants' budget periods would

29

continue without making an accompanying grant award. *Id.* at 34-35. The June 4 Order directed Defendants, by June 9, 2026, "to determine the appropriate continued award amount for the grants at issue," including "any determination that serves as the predicate for the funding of the grants," and to "issue GANs reflecting these award determinations." *NYCPS v. USDE*, 25-cv-08547,ECF Dkt 104.

81.    Despite the directive in the June 4 Order requiring Defendants to issue new GANs containing *appropriate* continuation awards, Defendants failed to comply.

### 1.   *The June 5, 2026 Requests for Additional Information*

82.    Late in the afternoon on Friday, June 5, 2026, each of the MSAP program directors received an email from the Department's Office for Civil Rights requesting additional information about one performance metric in the budget and performance reports that NYCPS had submitted, with a deadline of noon on Monday, June 8, 2026 to respond.

83.    NYCPS' counsel objected to the requests as improper and asked that the Department retract them in light of the June 4 Order, in which the Court held that the Department's ability to seek additional information was forfeited. The Department did not do so.[49]

### 2.   *The June 9, 2026 GANs*

84.    On June 9, 2026, the Department issued five new GANs to NYCPS. *NYCPS v. USDE*, 25-cv-08547, ECF Dkt 108-1. The contents of those GANs differed significantly from the Department's prior practice, and demonstrate that the Department once again failed to comply with the Court's Orders. First, the GANs made grant awards for FY2026, but they were dramatically reduced, and covered only the final 3 months of the grant year, from July 1, 2026 –

---

[49] On June 23, 2026, for the stated purpose of seeking information relevant to its upcoming 2026-2027 continuation determination, the Department requested the same additional information from NYCPS it had sought on June 5. NYCPS timely provided the information on July 8, 2026.

September 30, 2026. Second, the GANs stated that FY2026 would be the final budget year for the grants, appearing to indicate that the grants would end effective September 30, 2026. Thus, the GANs appeared to effectuate a non-continuation of the grants, beginning October 1, 2026, without issuing a Notice of Non-continuation—which would have denied NYCPS notice of the non-continuation and the opportunity to appeal or seek reconsideration. Third, the GANs imposed an unwarranted, punitive "reimbursement pay status" on the truncated grant awards.

### a. The Truncated 2025-2026 Grant Awards

85.     In calculating NYCPS' 2025-2026 MSAP grant awards, the Department used an unprecedented method that sharply reduced the scope and amount of the grant awards. In the initial GANs for these grants, issued at their inception, and in every subsequent GAN effectuating a grant continuation until this federal fiscal year, the expected amount of funding for each year was a uniform $2,999,999. The only exceptions were the "zero dollar" GANs issued on April 20, 2026 in begrudging response to the April 8 Order, and the June 9 GANs. Moreover, the initial GANs stated that although the grant amounts were not binding, the Department expected that they would be uniform over the full course of the grant performance period: "[t]he Secretary anticipates future funding for this award according to the schedule identified in Block 6." *NYCPS v. USDE*, 25-cv-08547, ECF Dkt 32-1 (GANs, Block 6 and Block 10, Item 1).

86.     In the June 9 GANs, however, the Department abandoned this practice and adopted an unprecedented funding method that resulted in major award reductions for FY2026. It imposed an offset against the grant amounts based on NYCPS' access to and use of FY2025 carryover funds in FY2026, as agreed to in the November 2025 Consent Order that resolved NYCPS' preliminary injunction motion by ensuring that funding would be available for NYCPS' magnet schools pending the resolution of the First Action.

87.     In connection with the Consent Order, on December 1, 2025, NYCPS had submitted budgets for each grant recipient's planned use of the carryover funds through the end of the 2025-2026 school year, June 30, 2026 (the interim funded period agreed upon in the Consent Order). Those budgets were *solely* intended to explain how NYCPS intended to use the carryover funds pending the resolution of anticipated expedited cross-motions for summary judgment on NYCPS' claims that the Discontinuation was unlawful. The budgets were not submitted in connection with a plan for how new MSAP grant funding for FY2026 would be used; rather, they projected how the magnet schools would use the carryover on an interim basis to continue operating during the pendency of the First Action, albeit on an austerity budget, and based only on the available carryover.

88.     The June 9 GANs obfuscated and mischaracterized the agreed-upon nature of the interim budgets NYCPS submitted pursuant to the Consent Order ("The grantee submitted and received approval of its budget through June 30, 2026"). Relying on this mischaracterization of what were intended as interim budgets, the Department replaced the new grant funding that NYCPS would otherwise have received in FY2026 with the carryover funding that had previously been awarded to NYCPS in prior years, thereby significantly cutting the FY2026 grant award. In so doing, it also truncated the new funding from an amount intended to cover the full grant year to an amount to cover only the last quarter of the year, July through September 2026—the period not covered by the interim budgets—on a pro-rata basis (dividing the anticipated total amount of the grant, rounded up to $3,000,000, by twelve months, and then multiplying that amount by three).

89.     Despite having been given budgets describing intended expenditures for each grant year in the initial grant applications for each grant, as well as in their partial-year APRs submitted in May 2025, and full-year APRs submitted on May 1, 2026, the Department

32

represented in the GANs that it had "limited information regarding the specific activities taking place in the last quarter of the performance period, and therefore the anticipated obligations of funds to be made." And ignoring its decades-long practice of issuing continuation awards based on those initial and APR budgets, the Department purported to determine the grant awards using an unprecedented calculation that awarded new grant funding only for the last quarter of the 2025-2026 grant year: it divided the "annual requested and recommended average award amount for [each] grant ($3,000,000) by the 12-month fiscal year period, resulting in an average monthly amount of $250,000, or $750,000 for the three-month continuation period."

90.    The Department then further reduced the grant awards for the grants that had carryover funding remaining in May 2026 by subtracting any carryover funds that were not yet encumbered or committed and thus remained available for expenditure through September 30, 2026. The resulting grant awards for the five NYCPS MSAP grants—for the entire 2025-2026 grant year—ranged from $497,869 to $750,000.

91.    Notably, the Department had never before adjusted MSAP grant awards from the expected amounts as set out in the initial GANs, or used available carryover funds to justify providing only truncated new funding for the grant awards. This was a misapplication of carryover funding. This funding is an integral and fully expected part of the MSAP grant cycles throughout the grants' performance period, given that the timing of grantees' access to new grant funds does not align with the school calendar, but rather is based on the federal fiscal year. For that reason, the initial grant award, which is always received well into the school year, can effectively only be used for planning activities in year 1 of the grant, resulting in unused funds that are carried over to the following year. In each subsequent grant year, the grant award again arrives after the school year is already underway, and schools operate using the prior year's carryover funds until the arrival of the next year's grant funding, resulting in some portion of the

new grant year funding being carried over at the conclusion of the year. As a result of this school year/grant funding year mis-alignment, the MSAP regulations provide grant recipients with the option of a 12-month period at the end of the grant, under a no-cost extension, to enable the use of remaining carryover funds to continue into a sixth year, which allows grantees to complete projects and activities that were planned under the grant, and promotes an orderly transition to self-sufficiency. 34 C.F.R. § 75.253(h).

92.     These changes in methodology were unprecedented and unexplained, and they relied on the interim relief agreed upon in the Consent Order as a temporary measure to allow the magnet schools to continue to operate—albeit on a forced austerity budget due to the unlawful Discontinuations that are the subject of this litigation—pending the Court's ruling on NYCPS' request for vacatur of the unlawful Discontinuation of the grants. But for the unlawful Discontinuation, the Department would not have been able to take advantage of the interim budgets. What was conceived of as a means to alleviate the harm caused by the Department's unlawful conduct became a tool to inflict further harm on NYCPS' magnet schools.

### b.  *The Apparent Grant Cut-offs*

93.     The June 9 GANs also appeared to indicate that FY2026 would be the final year of the MSAP grants. The GANs expressly state in the Terms and Conditions section that "this award supports the final budget period for this project. The recipient is required to submit all necessary reports to the Department of Education within 120 days after the end of federal support in accordance with 2 C.F.R. 200.328 and 200.329." This directive indicates that the grants would enter a wind-down period after September 30, 2026.  In addition to this express statement, the GANs also reflected in Block 6 a Performance Period ending on September 30, *2026*, instead of September 30 of either 2027 or 2028, depending on when each grant started.

94.     In declarations submitted by the Department in the First Action in connection with its opposition to NYCPS' second motion to enforce, the Department attempted to explain this purported grant discontinuation as an automatic "glitch" of the system based on the Department's truncation of the stated budget period of the grants. The Department's representations that the system is programmed to "automatically treat the grant as being in its final year" based on the budget period reflected in the GANs is, further evidence that these irregularities are a direct consequence of the unlawful non-continuations. Typically—and but for the unlawful non-continuations carried out by the Department before being vacated by the Court—the performance periods in each GAN would have reflected the entirety of the grants' original 5-year grant periods. Because the Department failed to restore the 5-year performance periods that existed in the initial GANs once the Discontinuations were vacated, the ripple effects of those unlawful actions have continued to prejudice NYCPS and the magnet schools.

### c. *The Pre-Reimbursement Approval Requirement*

95.     In addition to truncating the grant year funding and the performance period of the grants, the GANs also imposed an onerous and novel "reimbursement pay status"—a pre-reimbursement approval process—on the three-months of continuation funding awarded *that has never before been applied to NYCPS' grants* (the "Reimbursement Pay Condition"). The Reimbursement Pay Condition removes NYCPS' ability to immediately drawdown reimbursements by requiring that they receive advance approval of all expenditure reimbursements through the following process: grantees must pay for all expenditures using their own funds, submit documentation that substantiates that the expenditures are allowable under the grant, and then receive approval from the Department, all before being able to drawdown any reimbursement. This results in greater risk to NYCPS that expenditures will not be approved and will be NYCPS' responsibility.

### d.   The Gender Ideology EO Conditions

96.     Finally, the June 9 GANs also purport to impose restrictions on NYCPS MSAP

Projects based on the Department's interpretation of Title IX, including based on two of the

Gender Ideology EOs (the "Gender Ideology EO Conditions"):

> Please note the provisions of Executive Orders … 14168, … and 14190 as well as the U.S. Department of Justice's July 29, 2025, non-regulatory Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination, which clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion (DEI) programs.

> Such activities may risk violating federal civil rights laws and may jeopardize federal funding. This includes any discriminatory equity ideology in violation of a Federal anti-discrimination law. A definition of discriminatory equity ideology is contained in Section 2(b) of Executive Order 14190.

*NYCPS v. USDE*, 25-cv-08547, ECF Dkt 108-1 (GANs, Block 10, Item 7).

## J.   NYCPS' Second Motion to Enforce the April 8 Order and the June 4 Order

97.     On July 10, 2026, NYCPS moved again in the First Action to enforce the Court's

April 8 and June 5 Orders. NYCPS sought a new order vacating the June 9 GANs, and directing

Defendants to make new continuation awards consistent with prior practice, without

consideration of or reliance on the interim budget provided in connection with the November 20,

2025 Consent Order, or otherwise perpetuating the harmful effects of the Department's unlawful

non-continuation determinations, and without imposing punitive or otherwise onerous terms or

conditions based explicitly or implicitly on Title IX findings or "civil rights violations" related to

Title IX without following title IX procedures.

98.     In connection with its consideration of that motion, on July 13, 2026, the Court

ordered Defendants to provide the Administrative Record for the Department's June 9 GANs,

together with any supporting declarations, by July 20, 2026. *NYCPS v. USDE*, 25-cv-08547, ECF

Dkt 112. Neither the Administrative Record nor the declarations provide any lawful explanation

for the Department's actions in adopting a new method for calculating the grant awards for these MSAP grants, or for imposing pre-reimbursement requirements, even when given an additional opportunity by the Court to supplement the record to do so. *NYCPS v. USDE*, 25-cv-08547, ECF Dkt 113-1, 113-2, 113-3, 113-5, 113-6.

99.     When viewed in context, it is apparent that Defendants' actions since the April 8 Order were based on Title IX or "civil rights violations" related to Title IX. Defendants provided no explanation for adopting a new method for calculating grant awards for these MSAP grants, or for imposing pre-reimbursement requirements. Instead, the GANs continue to emphasize only the Department's objections to rulings based upon and enforcing the Court's April 8 Order:

> Consistent with the Department's original April 17, 2026, Notice of Continuation Determination, as noted earlier, **this award amount, as well as the certification required under 20 U.S.C. 7231d(c) is provided under protest and solely to comply with the court order requiring the Department to determine by June 9, 2026, the appropriate continued award amount for the grant at issue**.

*NYCPS v. USDE*, 25-cv-08547, ECF Dkt 108-1 (GANs, Block 10, Item 6) (emphasis added).[50]

100.     And, as already determined by the Court, the Discontinuation of the grants was based on the Department's "findings" that NYCPS' Guidelines violate Title IX. ("As a result of these findings, I will not certify NYC DOE's grant under 20 U.S.C. § 7231d(c).") *NYCPS v. USDE*, 25-cv-08547, ECF Dkt 6-1 at 3.

101.     Defendants issued both the April 17, 2026 notices of grant continuation and the June 9 GANs "under protest" and solely to comply in form, rather than in substance, with the April 8 and June 4 Orders. The GANs further specifically objected to providing the certification of compliance with civil rights laws. *NYCPS v. USDE*, 25-cv-08547, ECF Dkt 108-1(GANs, Block 10, Item 6).

---

[50] Despite the Department's repeated protestations, and its filing on June 8, 2026 of a Notice of Appeal from the April 8 Order, the Appeal was withdrawn on June 18, 2026.

102.    In the absence of any legitimate attempt to explain the Department's truncating of the grant period and the award amount, and based on its continued reference to its "protest" of the Court's vacatur of the Discontinuation, the Department's own statements demonstrate that Defendants are plainly still taking actions against NYCPS' MSAP grants on the same basis stated by then-Assistant Secretary Trainor—the purported finding that NYCPS' Guidelines violate Title IX.

103.    As a result of the Department's recent actions truncating the grant performance periods and award amounts and imposing reimbursement pay status the NYCPS MSAP grants are now confronting dire circumstances similar to, if not worse than, those faced in September 2025. They have only small amounts—and in some cases, negative balances—of carryover funds remaining, and the Department has provided only the bare minimum of funding it believes it can get away with, and only when forced to do so by multiple motions to enforce—all of which has allowed the "fruit of the poisonous" Discontinuations to continue to wreak havoc on the NYCPS magnet schools.

**K.  NYCPS Continues to be Harmed by the September 2025 Discontinuation of NYCPS' MSAP Grants, the Failure to Restore the Grants Upon the Court's Vacatur, And Ongoing Actions Taken by Defendants Impacting NYCPS and the Grants**

104.    In vacating the Discontinuation of NYCPS' MSAP grants based on NYCPS' alleged violation of Title IX—without notice, investigation, hearing, or opportunity to respond—the Court found the Department's actions failed to comply with the exacting process required by law to adjudicate a Title IX violation.

105.    The Department's Discontinuation of NYCPS' MSAP grants—which was effectuated October 1, 2025, and only vacated in April of 2026—greatly hampered NYCPS' ability to operate its 19 fledgling MSAP-funded magnet schools in 2025-2026, forcing them, initially, to operate without any new funding at all, and then, from December 1, 2025 to June 30,

2026, to operate pursuant to an interim, austerity budget using only unspent carryover funds. The consequences for NYCPS was that planned programming and projects were eliminated, reduced, or cast into doubt for the 2025-2026 school year and beyond.

106.    In the initial years of their MSAP grants, each of the nineteen schools, all of which received their initial MSAP funding in either FY2022 or FY2023, made significant investments to develop programmatic and curricular themes like STEAM; college readiness; teaching; journalism; visual, performing, and multimedia arts; and leadership. Defendants' actions in discontinuing, and then only partially restoring the grants by issuing only drastically-reduced funding for FY2026 based on a new funding methodology gave the MSAP Projects no opportunity to provide many of the services and events typically provided at the end of the FY2026 school year, summer enrichment activities for students, or planning for the upcoming school year.

107.    The unexpected and unprecedented truncation of the MSAP grants FY2026 funding devastated every student's 2025-2026 school year and unfairly curtailed the availability of the unique educational opportunities they were promised when they enrolled. The Schools' students have applied for and enrolled in these schools in reliance on the promise and expectation of a five-year federal commitment to support innovative and thematic curricula, purchase of equipment, development of specialized classrooms and partnerships with outside entities designed to provide exceptional learning environments and improved academic outcomes. Students who selected these magnet schools because of the creative and thematic programming were denied access to the core elements of their chosen educational path, in 2025-2026, including summer enrichment offerings.

108.    As predicted in the First Action, students that had been benefiting from these programs saw their educational programs transform into much poorer offerings overnight, with

the school year well under way. The absence of the expected full-year grant funding has also resulted in an inability to engage in necessary planning and preparatory work for the 2026-2027 school year and beyond.

109.    If the expected FY2025 MSAP grant awards are not restored to NYCPS, the Schools will have to immediately curtail educational opportunities for the start of the upcoming school year. Unknown numbers of future students who would have pursued these programs will not have those opportunities.

110.    Depriving the schools of necessary full-year funding after providing only two or three years of the expected, Congressionally-mandated, 5-years of financial support also severely reduces any hope of long-term sustainability for these programs because it prevents the schools from being able to fully develop their programs, and their capacity to continue as self-sustaining magnet schools.

111.    The Schools will face additional adverse impacts. Without the planned investment from federal funds, the Schools will be unable to hire or retain Magnet staff. Educators will not be able to receive training in curriculum planning or professional development to build teaching capacity, all necessary to implement Magnet curricula and impact student achievement, experiences, and opportunities. Delays in funding will prevent the acquisition of necessary supplies and equipment to support teaching and learning, diminishing the quality of students' educational experiences.  Finally,  the Schools will likely become less appealing to prospective families, who are likely to pursue different options, decreasing overall enrollment.

## V.    CAUSES OF ACTION
### COUNT I
### (Violation of the Administrative Procedure Act through
### Agency Action Without Observance of Procedure Required by Law (Title IX))

112.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

113.    Section 706 of the APA requires a reviewing court to "hold unlawful and set aside an agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

114.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Discontinuation of NYCPS' MSAP grants constituted final agency action subject to review under the APA.

115.    While Congress authorized federal agencies to enforce compliance with the requirements of their Title IX rules and regulations, "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until … there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed" by Title IX. 34 CFR § 106.81 (incorporating by reference 34 CFR § 100.8(c)); 20 U.S.C. § 1682.

116.    After completion of those procedures, the Department must also, before taking an action to terminate, or to refuse to grant or continue federal financial assistance, "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." 20 U.S.C § 1682.

117.    Congress expressly declared that any action by a department or agency terminating financial assistance is subject to judicial review, that "any State or political

subdivision thereof and any agency of either" may obtain judicial review, and that the federal agency's action "shall not be deemed committed to unreviewable agency discretion." 20 U.S.C. § 1683.

118.    As the Court found in the First Action on April 8, 2026, *NYCPS v. USDE,* ECF Dkt 83, the Discontinuation was effectuated without following the statutory and regulatory requirements of Title IX. There was no investigation, no express finding on the record of a failure by NYCPS to comply with Title IX, and the Department also failed to provide an opportunity for a hearing to NYCPS prior to any such finding. The Department also took these actions without filing the requisite report with Congress and waiting the required 30-day period after filing the report. The April 8 Order declared that the non-continuation determinations violated Title IX by cutting off funding without observance of the required procedures.

119.    By awarding NYCPS only a fraction of the funding accorded in past years of these grants, the June 9 GANs have ensured that NYCPS continues to be harmed by the Department's already-adjudicated Title IX violation. Consequently, Defendants have reduced NYCPS's MSAP funding without observance of the required Title IX procedures. The Grant Reduction would not have happened if the Department's prior Title IX violations had never occurred. Indeed, Defendants have all but admitted that fact, where they have expressly attempted to justify the Grant Reduction—a truncation of the grant budget period and drastic reduction of the NYCPS' MSAP Projects' FY2026 funding—by relying on an interim budget the parties agreed would govern the use of carryover funding solely during the pendency of the First Action, a lawsuit that arose from Defendants' prior Title IX violation. But for that violation, the First Action would not have occurred, and the interim budget never would have existed. By its actions, the Department has continued to wield its unlawful Discontinuation as a weapon, thereby causing harm to NYCPS and "refus[ing] to grant or continue Federal financial

42

assistance" based on Title IX without following the statutory and regulatory requirements of Title IX.

120.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the June 9 GANs as having been issued in violation of the procedures required by law; and rescinding, vacating and setting aside such GANs; and an order enjoining the Department from implementing, maintaining or reinstating such GANs.

## COUNT II
### (Violation of the Administrative Procedure Act through Agency Action Without Observance of Procedure Required by Law (GEPA, 2 C.F.R. § 200))

121.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

122.    Section 706 of the APA requires a reviewing court to "hold unlawful and set aside an agency action, findings, and conclusions found to be … without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

123.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the imposition of the Reimbursement Pay Condition constituted final agency action subject to review under the APA.

124.    The Reimbursement Pay Condition was governed by General Education Provisions Act ("GEPA") (20 U.S.C. § 1221 *et seq*.), and the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. § 200 *et seq.*).

125.    Prior to imposing the Reimbursement Pay Condition, the Department was required to provide NYCPS with, *inter alia*, notice of the nature of the Reimbursement Pay Condition, the reason for its imposition, and the method for requesting reconsideration of the Reimbursement Pay Condition. 20 U.S.C. § 1226a-1; 2 C.F.R. § 200.208.

43

126.    The Department imposed the Reimbursement Pay Condition without following these statutory and regulatory requirements.

127.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Department's imposition of the Reimbursement Pay Condition as in violation of the procedures required by law; and rescinding, vacating and setting aside such Reimbursement Pay Condition; and an order enjoining the Department from imposing, maintaining or reinstating such Reimbursement Pay Condition.

**COUNT III**
**(Violation of the Administrative Procedure Act through**
**Arbitrary and Capricious Agency Action)**

128.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

129.    The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

130.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Grant Reduction and the imposition of the Reimbursement Pay Condition (together, the "2026 Agency Actions") constituted final agency actions subject to review under the APA.

131.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citation modified). Moreover, "[t]he change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567 (2025). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display

44

awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* at 544 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22  (2016)).

### A. The Grant Reduction

132.    The Department's significant reduction of NYCPS's MSAP grant awards based on an unprecedented method of calculating the amounts and a misrepresentation of the nature of the "budget" that was submitted pursuant to the Consent Order, without reasoned explanation, is arbitrary and capricious. *FCC*, 592 U.S. at 423; *Wages & White Lion Invs.*, 604 U.S. at 567.

133.    The Grant Reduction is arbitrary and capricious because the Department did not articulate a satisfactory explanation for its methodology, including a "rational connection between the facts found and the choice made," and failed to consider important aspects of the problem. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Dep't of Com. Vs. New York*, 588 U.S. at 773. The Department failed to adequately explain its decisions to limit the grant award for the current grant year to the last quarter and to divide the annual requested and recommended average award for each grant ($3,000,000) by the 12-month fiscal year period.

134.    The Department claims that it had "limited information regarding the specific activities taking place in the last quarter of the performance period" but failed to acknowledge that NYCPS had already provided the Department with that information in its Annual Performance Reports. The Department also failed to adequately explain its decision to further reduce the grants by deducting from each grant the amount of carryover funds that were still available. By reducing the grants by the amount of carryover funds, the Department failed to consider that carryover funds are, and have always been, an integral, expected part of the MSAP grant cycle, given that the timing of grantees' access to new grant funds does not align with the school calendar but is based instead on the federal fiscal year. *See, e.g., supra* at ¶¶ 41-42. In recognition of the misalignment of the grant and school year calendars, the MSAP regulations

provide grantees with the option of a no-cost extension, enabling the use of all remaining carryover funds for each grant during a sixth year to support completion of activities allowed under the grant, and full program implementation within the scope of the project. *Id.* The Department failed to account for this usual and expected procedure and failed to offer any satisfactory explanation for the adoption of a methodology that represents a complete departure from the prior consistent agency procedure.

135.    The Grant Reduction, and specifically, the Department's methodology for calculating NYCPS's grant amounts, violates "[t]he change-in-position doctrine," by failing to "display awareness that [they are] changing position," and failing to "provide a reasoned explanation for the change." *Wages & White Lion Invs.*, 604 U.S. at 567 (quoting *Encino Motorcars, LLC*, 579 U.S. at 221–22). The methodology used to calculate NYCPS' FY2026 grant awards differs from any that in other GANs NYCPS has ever received. *Wages & White Lion Invs.*, 604 U.S. at 567. The Department's initial and predicted future grant awards for these GANs were uniformly $2,999,999 for each year. Subsequent continuation GANs all reflected the same expected five-year expected duration of the grants, with the same expected, uniform award amounts.

136.    The Department's imposition of an offset against the grant amounts based on NYCPS's access to and use of FY2025 carryover funds is unprecedented and without reasoned explanation. The Department has never before adjusted or reduced the MSAP grant awards from the expected amounts as set out in the initial GANs or reduced the awards based on carryover funds being available during subsequent budget periods.

137.    The Grant Reduction is also arbitrary and capricious because it fails to account for the serious reliance interests of NYCPS, the MSAP Program's participants and beneficiaries, such as students, teachers, and staff. *Wages & White Lion Invs.*, 604 U.S. at 567. NYCPS has

46

structured its budget with the understanding and expectation that the Department would make annual continuation awards that provide funding for the entirety of the grant year, for each of the 5-year project performance periods based on the MSAP Projects' performance, consistent with the Department's expressed priorities at the time of the application, as expressed in the Notice of Invitation to Apply. Discretionary Grantmaking at 31–32.

138. NYCPS also structured its budget based on an expectation that due to the mis-alignment of the grant year and the school year, at the end of every grant year there would remain unused funding that could be carried over until receipt of the following year's budget, allowing the schools to engage in planning and make purchases in the summer months for the upcoming school year. NYCPS also had an expectation, based on past practice and experiences, that the mis-alignment-of grant-year-and-school-year pattern would repeat annually so that at the end of each grant's final budget period, NYCPS would have access to carryover funding to fully complete each school's planned programming and projects in the year following the final funded grant year, in order to permit an orderly transition to self-sufficiency, and thereby to ensure the health and sustainability of the magnet schools after the five years of MSAP funding had been exhausted.

139. The Grant Reduction failed to consider that because available carryover funding was effectively exhausted in order to mitigate the effects of the unlawful Discontinuation on the magnet schools, the result of the Department's failure to provide new funding for the entirety of the grant year resulted in no funding remaining at the end of the school year to support summer planning and purchases for the upcoming school year. Instead, the drastic reduction in funding has compounded the harms associated with the Discontinuation and made it impossible for schools to plan for the upcoming year. *See supra* at ¶¶ 105-107.

140.    The Department also failed to account for the reliance interests of the MSAP Program's participants and beneficiaries: students—with the support of their parents—have chosen to enroll in the MSAP-funded Schools with the expectation that full magnet school funding by the Department will continue each year through the 5-year project term, consistent with federal law, to allow the realization of all of the benefits of the carefully-designed and planned magnet program, including summer enrichment programming during the summer months.

141.    Therefore, pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Grant Reduction as contrary to law, arbitrary and capricious and an abuse of discretion; rescinding, vacating and setting aside the GANs effectuating such Grant Reduction; and enjoining the Department from implementing, maintaining or reinstating such Grant Reduction.

**B.  The Reimbursement Pay Condition**

142.    The Department's decision to impose a rare and burdensome Reimbursement Pay Condition for the remaining three-month FY2026 grant continuation period, without reasoned explanation, is arbitrary and capricious. *FCC*, 592 U.S. at 423; *Wages & White Lion Invs.*, 604 U.S. at 567.

143.    The imposition of an unprecedented and substantially onerous Reimbursement Pay Condition violates the change in position doctrine, fails to provide a reasoned explanation for the change and fails to display awareness that the Department has changed its position. *Wages & White Lion Invs.*, 604 U.S. at 567.

144.    The Department has failed to offer a reasoned explanation—and in fact has offered *no* explanation at all—for imposing this unusual and onerous condition on NYCPS. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d

737, 740 (D.C. Cir. 1986) (finding federal agency action was arbitrary and capricious because there was no basis in the administrative record for the change, and the agency did not offer any explanation for its action).

145.    Neither the June 9 GANs, the administrative record produced by the Department on July 20, 2026, nor the declarations filed in support of the 2026 Agency Actions provided any reasoned explanation for its decision to impose the Reimbursement Pay Condition.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Yakima Valley Cablevision, Inc.*, 794 F.2d at 740.

146.    The Department's imposition of the Reimbursement Pay Condition fails to consider an essential part of the problem: that the pre-reimbursement approval process makes it very difficult to pay for expenditures, since, based on NYCPS' projections taking into account encumbrances, two of their grants have no carryover funds remaining, and one has less than $50,000 remaining. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The onerous approval process requires NYCPS to pay expenditures and assume liability if the Department unilaterally decides that they are not necessary or appropriate under the grants. Whereas, previously, NYCPS submitted budgets to the Department and was then permitted to draw down funds for expenditures made in accordance with those budgets, now, each expenditure must be approved before NYCPS can drawdown funds to cover it; if the Department decides to disapprove the expenditures after they have been incurred, NYCPS will be left to bear those costs.

147.    The Reimbursement Pay Condition also fails to consider the reliance interests of and harm to NYCPS, the MSAP programs, and the people—including students, teachers, and staff—that the programs serve. The Department fails to consider and account for the planning, recruitment, hiring, staffing needs, and curriculum development necessary for the upcoming school year and that NYCPS needs to be able to access the grant funds to meet those needs and develop the curricula.

49

148.    Therefore, pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the imposition of the Reimbursement Pay Condition on NYCPS' MSAP grants as contrary to law, arbitrary and capricious and an abuse of discretion; rescinding, vacating and setting aside the GANs imposing such Reimbursement Pay Condition; and enjoining the Department from imposing, maintaining or reinstating the Reimbursement Pay Condition

**COUNT IV**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) through Agency Action without Notice and Comment Rulemaking)**

149.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

150.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

151.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

152.    Under GEPA, the Department is required to follow the APA's notice-and-comment rulemaking procedure when changing rules guiding its enforcement of Title IX. *See* 20 U.S.C. §§ 1221e-4, 1232.

153.    The Department cannot purport to adopt and act upon a new interpretation of Title IX which guides the enforcement of Title IX with respect to discrimination based on gender identity without following the proper procedures.

154.    Without having proceeded through notice-and-comment rulemaking, the Department has purported to issue the USDE Grant Continuation Policy and, including through the application of the USDE Grant Continuation Policy, and the insertion of the Gender Ideology EO Conditions in the June 9 GANs, to adopt and act upon an interpretation of Title IX with respect to discrimination based on gender identity that targets and otherwise prejudices NYCPS' MSAP grants, including by effectuating a Grant Reduction, and imposing a Reimbursement Pay Condition, and its actions are procedurally invalid under the APA.

155.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Grant Reduction and the imposition of the Reimbursement Pay Condition as in violation of the procedures required by law; and rescinding, vacating and setting aside the June 9 GANs effectuating such Grant Reduction and imposing such Reimbursement Pay Condition; and an order enjoining the Department from implementing, imposing, maintaining or reinstating such Grant Reduction and/or Reimbursement Pay Condition.

**COUNT V**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) through Agency Action Contrary to Law)**

156.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

157.    The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

158.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the 2026 Agency Actions constituted final agency actions subject to review under the APA.

159.    An agency's action is contrary to law in the absence of statutory authorization for its act. *Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024). It may not rewrite clear

51

statutory terms to suit its own sense of how the statute should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

160.    The Department's reliance on the USDE Grant Continuation Policy to guide its grant continuation and funding determinations and its insertion in the June 9 GANs of the Gender Ideology EO Conditions—which are in turn derived from the Department's interpretation of Title IX—are contrary to law because they are entirely unsupported by any law, and contravenes the findings of several federal circuit courts that Title IX at the very least allows schools to permit transgender students to use facilities consistent with their gender, and in some cases actually requires such. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.,* 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (June 28, 2021) (affirming a grant of summary judgment that a school district policy that prohibited a transgender boy from using the boy's bathroom violated Title IX); *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) (affirming a preliminary injunction preventing the application of a policy denying a transgender student access to the bathroom consistent with their gender identity).

161.    In matters of statutory interpretation, courts are required to exercise independent judgment rather than deference to administrative agencies' interpretations. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391, 412-13 (2024).

162.    The Department's interpretation of Title IX is contrary to the decisions from multiple Circuit Courts that gender-inclusive policies for restrooms and other facilities are, at the very least, permitted, if not required by Title IX's prohibition of sex discrimination. *See Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) (affirming denial of preliminary injunction to plaintiff students who challenged policy permitting transgender students' access to

gender-conforming bathrooms, in decision issued from the bench); *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) (affirming the dismissal of similar claims).[51]

163.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment vacating and setting aside the Gender Ideology EO Conditions included in the June 9 GANs; and an order enjoining the Department from implementing, imposing, maintaining or reinstating the Gender Ideology EO Conditions.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff NYCPS prays that the Court:

a.    Vacate the FY2026 GANs issued on June 9, 2026;

b.    Issue new FY2026 continuation awards, including GANs, consistent with past practice— and the expected grant award set out in the original GANs—without consideration of, or reliance on, or otherwise perpetuating, the harmful effects of the Department's unlawful September 2025 non-continuation determinations;

c.    Issue new FY2026 continuation awards, including GANs, which do not impose punitive or otherwise onerous terms or conditions, except as permitted by applicable MSAP and/or GEPA procedures;

d.    Issue new FY2026 continuation awards, including GANs, which do not include the Gender Ideology EO Conditions;

e.    Preliminarily and Permanently enjoin and restrain the Department from freezing, terminating, reducing or otherwise interfering with any NYCPS' MSAP grant funding or imposing punitive or otherwise onerous terms or conditions on NYCPS' MSAP grant funding, except as permitted by applicable MSAP and/or GEPA procedures;

---

[51] The Supreme Court's decision in *West Virginia v. B.P.J.*, 225 L. ED. 2d 1040 (2026), which upheld State policies that bar transgender girls from participation on girls' sports teams, does not change the analysis; school districts remain free to adopt policies that allow transgender students to access gender-conforming restrooms and other facilities and to participate in sports consistent with their gender identity.

f.  Preliminarily and Permanently enjoin and restrain the Department from freezing, terminating, reducing or otherwise interfering with any NYCPS' MSAP grant funding or imposing punitive or otherwise onerous terms or conditions on NYCPS' MSAP grant funding, based explicitly or implicitly on, or otherwise perpetuating harms from, any concerns about, or findings by, the Department of NYCPS' alleged Title IX violations or civil rights violations related to Title IX, without complying with required procedures under Title IX;

g.  Issue other appropriate declaratory and injunctive relief as required to effectuate paragraphs a-f above;

h.  Retain jurisdiction of this case for the purpose of supervising the Department's full compliance with the Court's Order;

i.  Award NYCPS reasonable attorney's fees and costs in bringing this litigation; and

j.  Grant such other and further relief as this Court may deem proper.

Dated: July 31, 2026

STEVEN BANKS
Corporation Counsel of the City of
  New York
100 Church Street
New York, NY 10007
(212) 356-2276
mash@law.nyc.gov

By: Melanie C. T. Ash
June Buch
Hope Lu
Gavin Mackie
Emeline Kong

*Attorneys for Plaintiff The Board of Education of the City School District of the City of New York*