UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, LINDA MCMAHON, in her capacity as Secretary of the United States Department of Education, KIMBERLY M. RICHEY, in her capacity as Assistant Secretary for Civil Rights, and LINDSEY M. BURKE, in her capacity as Deputy Chief of Staff for Policy and Programs,<br><br>Defendants. | No. 25 Civ. 08547 (AS) |
| THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, LINDA MCMAHON, in her capacity as Secretary of the United States Department of Education, MURRAY BESSETTE, in his capacity as Principal Deputy Assistant Secretary and Acting Assistant Secretary of Education, JENNIFER TODD, in her capacity as Director of the Division of Family Empowerment and Education Choice, LAVANA WEEMS, in her capacity as Supervisory Management Analyst,<br><br>Defendants. | No. 26 Civ. 06584 (AS) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT IN 26 CIV. 06584, IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN 26 CIV. 06584, AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION IN 25 CIV. 08547 AND 26 CIV. 06584**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
*Attorney for Defendants*

JEFFREY OESTERICHER
Assistant United States Attorney
- Of Counsel -

# TABLE OF CONTENTS

**Page**


**PRELIMINARY STATEMENT** ........ **1**

**BACKGROUND** ........ **3**

I. The Court Orders ED to Make Continuation Determinations ........ 3

II. Plaintiff's First Motion to Enforce ........ 4

III. ED Complies with the June 4 Order ........ 5

IV. NYCPS *II* ........ 9

**LEGAL STANDARD** ........ **10**

I. Legal Standard Governing Dismissal for Lack of Subject Matter Jurisdiction ........ 10

II. Legal Standard Governing APA Summary Judgment ........ 10

**ARGUMENT** ........ **11**

I. The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiff's Claims ........ 11

II. This Court Does Not Have Jurisdiction Under 20 U.S.C. § 1683 ........ 16

III. In the Alternative, the Government Is Entitled to Summary Judgment ........ 17

A. Defendants Observed All Procedures Required by Law When Issuing the June 9 GANs (Counts I and II) ........ 18

B. The Agency's Actions Were Not Arbitrary and Capricious (Count III) ........ 21

C. No Further Notice and Comment Rulemaking Was Required (Count IV) and ED's Actions Were Not Contrary to Law (Count V) ........ 25

IV. Plaintiff Has Failed to Establish the Factors Necessary to Obtain an Injunction ........ 28

**CONCLUSION** ........ **29**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Association of University Professors v. Dep't of Justice*,
No. 25-cv-2429 (MKV), 2025 WL 1684817 (S.D.N.Y. Jun. 16, 2025) .......... 29

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) .......... 28

*Atterbury v. U.S. Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015) .......... 12

*B.K. Instrument, Inc. v. United States,*
715 F.2d 713 (2d Cir. 1983) .......... 12

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 15

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 27

*County of Suffolk, N.Y. v. Sebelius*,
605 F.3d 135 (2d Cir. 2010) .......... 25

*Daniels v. Moores*,
No. 24-30-PR, 2025 WL 883035 (2d Cir. Mar. 21, 2025) .......... 28

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 15, 20, 24

*Fairfax Cnty. School Bd. v. McMahon*,
798 F. Supp. 3d 563 (E.D.V.A. 2025) .......... 16

*Falls Riverway Realty, Inc. v. City of Niagara Falls,*
754 F.2d 49 (2d Cir. 1985) .......... 13

*FDA v. Wages & White Lion Invs. L.L.C.*,
604 U.S. 542 (2025) .......... 23

*Friends of Animals v. Romero*,
948 F.3d 579 (2d Cir. 2020) .......... 11

*Friends of Ompompanoosuc v. FERC*,
968 F.2d 1549 (2d Cir. 1992) ........................................ 11

*Giammatteo v. Newton*,
452 F. App'x 24 (2d Cir. 2011) ........................................ 10

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................ 25

*Hendrickson v. United States*,
791 F.3d 354 (2d Cir. 2015) ........................................ 15

*Kamen v. American Tel. & Tel. Co.*,
791 F.2d 1006 (2d Cir. 1986) ........................................ 10

*Karpova v. Snow*,
497 F.3d 262 (2d Cir. 2007) ........................................ 11

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................ 26, 27

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................ 11

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) ........................................ 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 11

*MPD Accessories B.V. v. Urb. Outfitters, Inc.*,
No. 12 CIV. 6501 (LTS) (KNF), 2013 WL 6869919 (S.D.N.Y. Dec. 23, 2013) ........................................ 10

*Nat'l Audubon Soc. v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) ........................................ 11, 13

*New York v. National Science Foundation*,
793 F. Supp. 3d 562 (S.D.N.Y. 2025) ........................................ 14

*NIH v. American Public Health Association*,
145 S. Ct. 2658 (2025) ........................................ 12, 16

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................ 28

*Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n*,
306 F.2d 840 (2d Cir. 1962) ........ 10

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) ........ 28

*Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union Free School Dist.*,
478 F.3d 494 (2d Cir. 2007) ........ 27

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of HUD*,
175 F.3d 132 (2d Cir. 1999) ........ 12, 29

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*,
31 F. Supp. 3d 571 (S.D.N.Y. 2014) ........ 11

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........ 15, 16, 18, 24, 26

*Tzumi Innovations LLC v. Regan*,
557 F. Supp. 3d 499 (S.D.N.Y. 2021) ........ 28

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999) ........ 12, 13

*UPMC Mercy v. Sebelius*,
793 F. Supp. 2d 62 (D.D.C. 2011) ........ 11

**Statutes**

5 U.S.C. § 701 ........ 11, 25
5 U.S.C. § 702 ........ 25
20 U.S.C. § 1226a-1 ........ passim
20 U.S.C. § 1683 ........ passim
20 U.S.C. § 7231(d) ........ 26

**Rules**

Fed. R. Civ. P. 56(a) ........ 10
Fed. R. Civ. P. 65(b)(2) ........ 10
Fed. R. Civ. P. 12(b)(1) ........ 29

**Regulations**

2 C.F.R. § 200.207 ........ 21
2 C.F.R. § 200.208 ........ 21, 22
2 C.F.R. § 3474.1 ........ 21
2 C.F.R. § 3474.10 ........ 21

34 C.F.R. § 75.118(a) .......... 4
34 C.F.R. § 75.236 .......... 12, 13
34 C.F.R. § 75.253(a)(3) .......... 26
34 C.F.R. § 75.253(e) .......... passim

## PRELIMINARY STATEMENT

In its April 8, 2026 Order, this Court vacated the U.S. Department of Education's ("ED") decision not to continue five New York City Public Schools ("NYCPS") Magnet School Assistance Program ("MSAP") grants and directed ED to make a continuation determination. ED continued all five grants for Fiscal Year ("FY") 2026, issued Grant Award Notifications ("GANs") effectuating that determination, and—following this Court's June 4, 2026 Order—awarded continuation funding for FY 2026 on June 9, 2026 (the "June 9 GANs"). In making that award, ED did not consider Title IX or any other civil rights concern. It instead applied the terms and conditions of the parties' grant agreements, including 34 C.F.R. § 75.253(e), which expressly permits the Secretary to account for a grantee's available carryover funds in setting a continuation award. The result is that NYCPS had $14,958,933 in MSAP funding available to it during FY 2026—less than one percent below the $14,999,995 in estimated awards reflected in the initial GANs and millions of dollars more than it expended in either of the prior two fiscal years.

Dissatisfied with the amount of funding, Plaintiff filed this second action, asking the Court to vacate the June 9 GANs, replace them with "lawful" and "appropriate" GANs, and enjoin ED from ever again "reducing" or conditioning its MSAP funding. Plaintiff also moved for a temporary restraining order ("TRO") and injunction in both actions. As a matter of law, Plaintiff is not entitled to that relief.

First, this case should be dismissed for lack of subject matter jurisdiction. Unlike the original complaint in *NYCPS I*, this action is a dispute about the size of an award ED has already made and the conditions attached to it. The source of Plaintiff's asserted entitlement to $2,999,999 per grantee is not Title IX or any other statute; it is the GANs themselves, which Plaintiff invokes to claim a funding expectation while simultaneously asking the Court to strike a term of those

same contracts. And Plaintiff's objective is unmistakably monetary, as confirmed by its request that the Court enter a TRO requiring ED to set aside $11,754,296 "so that a remedy will remain available." Such a claim belongs in the Court of Federal Claims under the Tucker Act. Nor does 20 U.S.C. § 1683 supply jurisdiction: that provision applies only to actions "not otherwise subject to judicial review" that terminate or refuse to grant or continue assistance based on a Title IX finding. Neither condition is satisfied. Review is available in the Court of Federal Claims, and ED neither terminated nor refused to continue any grant—it continued all five and funded them.

Second, the Government is entitled to summary judgment on the administrative record. Count I rests on the premise that ED "reduced" funding for Title IX reasons without following Title IX procedures. The record forecloses that premise: ED made the required civil rights certification, expressly did not consider any actual or alleged civil rights concerns in issuing the June 9 GANs, and never guaranteed any particular funding amount—the initial GANs stated that future figures were "estimates only" that "do not bind the Secretary." Count II fails because reimbursement pay status is committed to the Secretary's discretion under 20 U.S.C. § 1226a-1, a statute that supplies no judicially manageable standard of review. Count III fails because ED acted reasonably in making more funds available to Plaintiff in FY 2026 than Plaintiff expended in either of the prior two fiscal years. ED calculated each award by prorating the estimated annual amount for the portion of the fiscal year not covered by Plaintiff's approved school-year budgets and accounting for the nearly $12,000,000 in carryover funding ED had already made available for the fiscal year. Counts IV and V fail because ED did not rely on the memo cited by Plaintiff or the executive orders—leaving Plaintiff without standing or a ripe controversy. And Count IV fails for the additional reason that, to the extent that Plaintiff mounts a challenge to the policy memo, interpretive rules require no notice and comment.

Finally, Plaintiff has not established its entitlement to injunctive relief. An order barring ED from considering carryover funds or imposing payment conditions is, in substance, a demand for specific performance of the grant agreements, which the Tucker Act forbids. Plaintiff's claimed irreparable harm is a shortfall of money, redressable in the Court of Federal Claims. And the equities and public interest disfavor an injunction that would displace the Secretary's discretionary stewardship of appropriated funds. For these reasons, Defendants' cross-motion to dismiss or, in the alternative, for summary judgment should be granted, and Plaintiff's motions for summary judgment and a preliminary injunction should be denied.

## BACKGROUND

### I. The Court Orders ED to Make Continuation Determinations

Plaintiff filed its first Complaint on October 15, 2025. *See Bd. of Educ. of the City of New York v. U.S. Dep't of Education*, No. 25 Civ. 8547 ("*NYPCS I*"), ECF No. 1 ("*NYPCS I* Compl."). In the Complaint, Plaintiff sought an order: (1) "enjoining the Department's Discontinuation of NYCPS's MSAP grants," *NYPCS I* Compl. ¶¶ 108, 115, 127, 134; (2) "[p]reliminarily and permanently enjoin[ing] the Department from implementing, maintaining, or reinstating the Discontinuation, or otherwise taking any other action to suspend, terminate, or refuse to continue the NYCPS' MSAP grants for the FY25 and FY26 periods," *id.* at Prayer for Relief (b); (3) ordering the continuation of the NYCPS MSAP grants, *id.* at Prayer for Relief (c); and (4) enjoining "the Department from freezing, terminating or otherwise interfering with any NYCPS' MSAP grant funding . . . ," *id.* at Prayer for Relief (d). In its motion for summary judgment, Plaintiff modified its requested relief, dropping its request to order ED to continue the grants and its request to enjoin ED from "interfering with [any NYCPS] MSAP grant funding." *See NYPCS I*, ECF No. 75.

On April 8, 2026, the Court granted Plaintiff's motion for summary judgment. *NYPCS I*, ECF No. 83 (the "April 8 Order"). In holding that the Tucker Act did not preclude its jurisdiction, the Court found "important" that NYCPS "[was] only seeking that the non-continuation decision be vacated with no guarantee that any money will ultimately flow," and that "NYCPS's summary-judgment motion d[id] not seek to have this Court order that any money be paid out . . . . Defendants would have to make a continuation decision after vacatur for any funds to flow—none would flow as an immediate result." *Id*. at 4-5 (internal citation omitted). The Court, then, vacated ED's non-continuation determination with respect to the NYCPS's MSAP grants, permanently enjoined ED from non-continuing NYCPS's MSAP grants based on Title IX findings or a civil rights violation related to Title IX without following the procedures required by Title IX, and ordered ED "to make a continuation determination with respect to each of NYCPS's MSAP grants within 10 days of this order." April 8 Order at 10. Notably, the Order did not require ED to disburse any funds. *Id*.

## II. Plaintiff's First Motion to Enforce

On April 17, 2026—within 10 days of the Order—ED issued letters to each of the MSAP grantees notifying them that the "grant award is being continued from October 1, 2025 through September 30, 2026." *See* Declaration of Murray Bessette dated May 21, 2026, *NYPCS I*, ECF No. 94 ("May 2026 Bessette Decl.") ¶ 2 & Exhibit ("Ex.") A at 1. The letters noted that "this continuation determination is being issued in protest and solely to comply with the [ ] [O]rder, and the Department continues to have concerns regarding your grant." *Id*. On April 20, 2026, ED issued GANs effectuating the continuation determination. *Id*. ¶ 3 & Ex. B. The budget and performance periods for the grants were continued through September 30, 2026. *Id*. ¶ 4.

With respect to grant funding, the April 17 letters informed the grantees that, pursuant to 34 C.F.R. § 75.118(a), ED would be requesting "updated grant performance and financial

information before making available further funding," that the requested information "is needed to fulfill [ED's] responsibility to understand the grant's current operations and to determine an appropriate continuation award," and that following production and review of the requested information, ED "will evaluate the amount of continuation funding consistent with the procedures of 34 C.F.R. § 75.253(e)." *Id.* ¶ 2 & Ex. A at 1. ED also noted that the grantees continue to have access to carryover funds (*i.e.*, excess funds not expended as budgeted) based on their previously approved budgets. *Id.* at 1-2. Those budgets were submitted and approved in connection with this Court's November 20, 2025 Consent Order, *NYPCS I*, ECF No. 42. Pursuant to that order, the parties resolved NYCPS's motion for a preliminary injunction and permitted NYCPS to access non-expended funds awarded in and carried over from Fiscal Year 2025 for the period of October 1, 2025 through June 30, 2026. *Id.* ¶ 1. The previously approved budgets submitted by the grantees identified their projected expenditures for the school year based on the available carryover funding. Declaration of Jennifer Todd dated May 22, 2026, *NYPCS I*, ECF No. 95 ¶ 10.

On May 14, 2026, Plaintiff filed a motion to enforce the April 8 Order, seeking to compel ED to make a funding amount determination for FY 2026 on the newly continued grants. *See NYPCS I*, ECF No. 85. On June 4, 2026, that motion was granted. *NYPCS I*, ECF No. 104 (the "June 4 Order"). This Court's order required ED "to determine the appropriate continued award amount for the grants at issue" by June 9, 2026, including "any determination that serves as the predicate for the funding of the grants by [that] deadline, as well as issue GANs reflecting those award determinations." *Id.*

**III. ED Complies with the June 4 Order**

On June 9, 2026, in accordance with the June 4 Order, ED awarded funding for Plaintiff's five MSAP grants. Declaration of Jennifer Todd dated July 20, 2026, *NYPCS I*, ECF No. 113-2 ("Todd Decl.") ¶ 4. The award covered the entirety of FY 2026. *See, e.g.*, *NYCPS I*, ECF No. 113-

6 at USDOE-Continuation_000784 (identifying, in Boxes 6 and 7, the budget period as 10/1/2025 – 9/30/2026 and awarding funding for the same period). ED determined the appropriate amount of funding for FY 2026 based on MSAP Annual Performance Reports submitted by Plaintiff, Plaintiff's 2025-26 school year budgets, the amount of FY 2025 carryover funding available to the grantees, and the assumption that the grantees would use the maximum amount of expected funds during the period of FY 2026 not covered by Plaintiff's school year budgets. *See NYCPS I*, ECF No. 113-5 & 113-6. Funding determinations for future fiscal years have not yet been made by ED. Bessette Decl. ¶ 9. In determining the FY 2026 awards, ED reviewed the amount of carryover funding available to the grantees during the fiscal year (approximately $11,713,234), the budgets submitted for the 2025-26 school year, and a May 2026 filing from Plaintiff identifying each grantee's remaining carryover funding given anticipated personnel costs and open encumbrances. Declaration of Murray Bessette dated July 20, 2026, *NYPCS I*, ECF No. 113-1 ("Bessette Decl.") ¶¶ 5-6. ED then took the annual requested and estimated average award amount as stated in Plaintiff's initial GANs ($2,999,999 rounded up to $3,000,000) and divided it by 12 to determine a monthly estimated average award amount ($250,000). Bessette Decl. ¶ 6(a).[1] Because ED had limited information regarding the specific activities the grantees planned for the three-month period remaining in the fiscal year (July 1, 2026 to September 30, 2026), ED multiplied the monthly estimated average award amount described above ($250,000) by 3 equaling $750,000 for each grantee. *Id.* at 6(b). To the extent that plaintiff had previously identified particular grantees

[1] Pursuant to the parties' consent order dated November 20, 2025, Plaintiff had access to its large carry-over balances through June 30, 2026. *See NYPCS I*, ECF No. 42. Plaintiff submitted, and received approval for, budgets to utilize the remaining carry-over funding through that date. Bessette Decl. ¶ 6(b). The June 9 GANs permitted the grantees to continue using the carryover funding for the remainder of the fiscal year.

with additional carry-over funding remaining, that amount was subtracted from the $750,000 figure. *Id.* ¶ 6(c).

The chart below illustrates ED's calculations:

| Grant | Annual Requested & Estimated Average Award Amount | Average Three-Month Award | Remaining Carry-Over Funds as reported by grantee | June 9 GAN Award Amount | Total amount of funds available for FY26 | Percentage of Annual Requested & Estimated Average Award Amount |
|---|---|---|---|---|---|---|
| **S165A220032** | $2,999,999 | $750,000 | $0 | $750,000 | $2,217,172 | 74% |
| **S165A220034** | $2,999,999 | $750,000 | $252,131 | $497,869 | $3,682,792 | 123% |
| **S165A220037** | $2,999,999 | $750,000 | $211,808 | $538,192 | $2,983,374 | 99% |
| **S165A230011** | $2,999,999 | $750,000 | $40,362 | $709,638 | $2,583,924 | 86% |
| **S165A230012** | $2,999,999 | $750,000 | $0 | $750,000 | $3,491,671 | 116% |

*Id.* ¶ 7.[2] When making the funding decision, in accordance with the Court's June 4 Order, ED "did not consider any alleged or actual civil rights violations or civil rights compliance concerns, including those regarding Title IX." *Id.* ¶ 8. Indeed, ED made the necessary civil rights certification prior to making the funding determinations noting that such certifications were being made "under protest and solely to comply with the Court Order." *See* USDOE-Continuation_001077-001081.

[2] It would not be correct to find, as Plaintiff suggests, that ED did not award any funds to Plaintiff for the first nine months of FY 2026. *See Bd. of Educ. of the City of New York v. U.S. Dep't of Education*, No. 26 Civ. 6584 ("*NYPCS II*"), ECF No. 32 (Transcript of Conference Held on Aug. 27, 2026) at 2-3. The award covered the entirety of FY 2026. *See, e.g.*, *NYCPS I*, ECF No. 113-6 at USDOE-Continuation_000784 (identifying, in Boxes 6 and 7, the budget period as 10/1/2025 – 9/30/2026 and awarding funding for the same period). Further, ED made available to the grantees nearly $12 million in carryover funds, which Plaintiff used during the 2025-26 school year. Nor is it fair for Plaintiff to characterize this as "zeroing out [its] budget." *Id.* at 4. As discussed *infra*, grantees are not entitled to carryover funds from year to year and ED retains the discretion by regulation (34 C.F.R. § 75.253(e)) to consider the amount of carryover funds in making MSAP grant awards.

As a result, ED made available to Plaintiff millions of dollars more in funding than it expended in either of the prior two fiscal years:

| Grant | FY 24 Expenditure | FY 25 Expenditure | Total amount of funds available for FY 26[3] |
|---|---|---|---|
| **S165A220032** | $2,130,128[4] | $2,836,274[5] | $2,217,172 |
| **S165A220034** | $2,209,540[6] | $2,672,860[7] | $3,682,792 |
| **S165A22037** | $2,447,982[8] | $2,714,828[9] | $2,983,374 |
| **S165A230011** | $1,747,142[10] | $1,767,164[11] | $2,583,924 |
| **S165A230012** | $1,854,481[12] | $2,317,314[13] | $3,491,671 |
| **Total** | $10,389,273 | $12,308,440 | $14,958,933 |

In addition, when continuation funds were awarded, all five grants were placed into "Reimbursement Pay Status," in accordance with the Secretary's authority under 20 U.S.C. § 1226a-1. Todd Decl. ¶ 8; *see also* 20 U.S.C. § 1226a-1 ("Payments pursuant to grants or contracts under any applicable program may be made . . . by way of reimbursement . . . as the Secretary may determine."). This status does not prohibit access to funds; it requires grantees to spend their own funds first and then request reimbursement along with appropriate documentation. Todd Decl. ¶ 9.

[3] *See* Bessette Decl. ¶ 7.
[4] *NYCPS II*, ECF No. 113-5, at USDOE-Continuation_000135.
[5] *Id.*
[6] *Id.* at USDOE-Continuation_000088.
[7] *Id.*
[8] *Id.* at USDOE-Continuation_000188.
[9] *Id.*
[10] *Id.* at USDOE-Continuation_000002.
[11] *Id.*
[12] *Id.* at USDOE-Continuation_000084.
[13] *Id.*

On July 10, 2026, Plaintiff filed a second motion to enforce arguing that ED failed to comply with this Court's prior orders because it allegedly "severely reduced" grant funding for this year and placed the grants in reimbursement status. *NYPCS I*, ECF No. 110 at 4. That motion remains pending before the Court.

**IV. NYCPS *II***

On July 31, 2026, Plaintiff filed a subsequent lawsuit challenging the alleged reduction of grant funding for FY2026 and the placement of the grants in reimbursement status. *See NYPCS II*, ECF No. 1 ("*NYPCS II* Compl."). In the *NYPCS II* Complaint, Plaintiff seeks an order vacating the June 9 GANs and that they "be replaced with new GANs for FY2026 reflecting a lawful, appropriate, full year funding determination . . . ." *NYCPS II* Compl. ¶ 1. NYCPS also seeks both a preliminary and permanent injunction to prevent ED "from freezing, terminating, reducing or otherwise interfering with any NYCPS' MSAP grant funding or imposing punitive or otherwise onerous terms or conditions on NYCPS' MSAP grant funding . . . ." *NYCPS II* Compl. Prayer for Relief (e)-(f).

On August 26, 2026, Plaintiff moved for summary judgment on their *NYCPS II* claims, *NYCPS II*, ECF No. 22, and for a temporary restraining order and preliminary injunction requiring ED to "set aside sufficient funds to ensure that they are available to be awarded" should the June 9 GANs be vacated and replaced with new GANs reflecting "new, lawful, [and] appropriate grant funding awards," and suspending the statutory lapse date for FY 2026 appropriated funds, *NYCPS II*, ECF No. 21. On August 28, 2026, this Court entered a TRO enjoining ED "from obligating, disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable to Plaintiff by any means at least $11,754,296 of the funds appropriated" for FY 2026 MSAP grants and

ordering ED to ensure that the funds "remain available to be obligated and disbursed to Plaintiff" for the challenged MSAP grants. *NYCPS II*, ECF No. 31.[14]

## LEGAL STANDARD

### I. Legal Standard Governing Dismissal for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). On a Rule 12(b)(1) motion, a district court "may refer to evidence outside the pleadings." *Id.* (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)). The plaintiff "has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011).

### II. Legal Standard Governing APA Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, a party seeks judicial review of agency action, summary judgment is

[14] The Court ordered that the TRO shall extend until September 21, 2026, a period of more than three weeks. *See NYCPS II*, ECF No. 31 at 2. However, there is authority in this Circuit that Federal Rule of Civil Procedure 65(b)(2) only permits a TRO to extend for an initial period of 14 days, even where (as here) the TRO was issued on notice. *See MPD Accessories B.V. v. Urb. Outfitters, Inc.*, No. 12 CIV. 6501 (LTS) (KNF), 2013 WL 6869919, at *5 (S.D.N.Y. Dec. 23, 2013) ("Although the October 3, 2012 temporary restraining order was not issued without notice, since the defendants appeared at the hearing on the plaintiff's application for a temporary restraining order conducted on the same date, in this circuit, a temporary restraining order issued with notice is also subject to Rule 65(b)(2)'s time limitation, and that notice cannot be used to 'extend indefinitely beyond the period limited by the Rule the time during which a temporary restraining order remains effective.' [*Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n*, 306 F.2d 840, 842 (2d Cir. 1962)]. Thus, the October 3, 2012 temporary restraining order was subject to Rule 65(b)(2)'s time limitation, and was to expire 14 days after it was issued, unless before that time the court, for good cause, extended it for a like period or the adverse party consented to a longer extension.").To the extent that a 14-day limit applies, the Court's TRO would expire on September 11, 2026, and would have to be extended for good cause to at least the date of the preliminary injunction hearing, September 21, 2026 (to which the government would consent).

appropriate, since 'whether an agency action is supported by the administrative record and consistent with the APA standard of review' is decided 'as a matter of law.'" *Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) (quoting *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011)). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

The APA, 5 U.S.C. § 701 *et seq.*, provides for judicial review of challenges to final agency actions. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990). "Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). This "narrow" standard does not allow a court "'to substitute its judgment for that of the agency.'" *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, a court may overturn an agency's action only if it finds that the agency has relied on factors which Congress "'has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

### I. The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiff's Claims

This dispute is contractual, regards grant funding, and thus beyond the Court's jurisdiction. Plaintiff is dissatisfied with the amount of funding ED awarded to it on June 9 and brings this

action challenging what Plaintiff calls a "Grant Reduction" and the reimbursement payment method placed on the funding as part of the contracts—the June 9 GANs—entered into between NYCPS and ED. *NYCPS II*, ECF No. 23 ("Pl.'s Br.") at 8-9. "Where a claim arises out of a contract with the United States, the Tucker Act 'impliedly forbids' relief other than the remedy provided by the Court of Federal Claims." *See Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of HUD*, 175 F.3d 132, 143 (2d Cir. 1999). "Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases his claims, and . . . the type of relief sought.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999)) (citation omitted). Where "'the prime objective of the plaintiff is to obtain money from the Government,'" the Court lacks jurisdiction. *See Presidential Gardens Assocs.*, 175 F.3d at 143 (quoting *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir. 1983)).

Here, Plaintiff complains that the funding made available to it in FY 2026 is inappropriate as it is allegedly below the $2,999,999 yearly award it expected and to which it claims entitlement. Pl.'s Br. at 11-13; 15-18. The source of this purported entitlement is not Title IX or some other statutory or regulatory source but rather the contract between ED and NYCPS—the GANs. *See, e.g.*, *NIH v. American Public Health Association*, 145 S. Ct. 2658, 2661 (2025) (per curiam) (treating grants as contracts) and 34 C.F.R. § 75.236 (stating that the GANs "obligate[] both the Federal Government and the grantee to the requirements that apply to the grant."). Plaintiff argues that the grantees are entitled to receive $2,999,999 annually because "[t]he Department's initial and predicted future grant awards for these GANs were uniformly set at $2,999,999 for each year." Pl.'s Br. at 16. Plaintiff also argues that the methodology used to calculate the award amount was

inappropriate as it differs from the methodology used to calculate awards under past GANs. *Id*. Further, Plaintiff disputes ED's use of 34 C.F.R. § 75.253(e)—a regulation incorporated into the GANs permitting ED to consider available carryover funding to determine the appropriate funding amount—and argues that ED disregarded that "MSAP regulations"—all of which are incorporated as terms of the contracts between ED and NYCPS—"recognize the critical role of carryover funding." *Id*. at 15-16. Accordingly, the basis for Plaintiff's claimed relief is contractual; without the GANs Plaintiff could not claim to expect additional funds. *See Up State Fed. Credit Union*, 198 F.3d at 377; *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 55 (2d Cir. 1985).

While Plaintiff artfully drafts its requested relief to seek vacatur and avoids asking the Court to order a specific funding award, it is abundantly clear that Plaintiff's primary objective is to obtain more money from ED. As discussed above, ED has already continued the grants, issued a FY 2026 funding award, and made nearly $15,000,000 available to the grantees during the current fiscal year. In issuing the funding, ED did not consider alleged or actual Title IX violations, Bessette Decl. ¶ 8, but exercised its contractual authority under 34 C.F.R. § 75.253(e) to consider carryover funds available to the grantees in issuing the award amount, *id*. ¶ 6. Dissatisfied with the funding amount, Plaintiff challenges the "Grant Reduction" and claims that it is entitled to $2,999,999 for each grantee because of the expectation set in the GANs. Pl.'s Br. at 15-18. In other words, Plaintiff seeks additional funding from the Government, which this Court cannot grant under the Tucker Act. *See* April 8 Order at 8 (holding that the Court "cannot . . . order defendants to expend any funds to NYCPS").

Plaintiff's monetary aim is further laid bare by its TRO and preliminary injunction. Under the TRO requested by Plaintiff, the Court ordered ED to set aside a specific amount of funds

($11,754,296) for the grantees. *NYCPS II*, ECF No. 31. NYCPS requested this relief "so that a remedy will remain available in the event that Plaintiff prevails on its claims." Pl.'s Br. at 9. This is a concession from Plaintiff that the remedy it seeks is the disbursement of additional funds from ED—indeed a specific amount of funds—something this Court is prohibited from ordering under the Tucker Act. *See New York v. National Science Foundation*, 793 F. Supp. 3d 562, 583 (S.D.N.Y. 2025) (finding that plaintiffs "primarily asserted a right to payment of the funds promised in the grant awards" based, in part, on plaintiffs' preliminary injunction brief that "reveals their focus on the termination of the grant awards").

Further, Plaintiff takes issue with ED's reliance upon 34 C.F.R. § 75.253(e) in determining the appropriate continuation award amount. Pl.'s Br. at 15-18. To the extent Plaintiff seeks to enjoin ED from relying upon the FY 2025 carryover funds available to Plaintiff in FY 2026, that request is contractual in nature as it would prevent ED from exercising its rights under the GANs. As noted above, 34 C.F.R. § 75.253(e) is incorporated into the contracts between ED and the grantees. Accordingly, Plaintiff's requested relief impermissibly sounds in contract.

This case is also distinguishable from *NYCPS I*. In *NYCPS I*, the Court held that it had subject matter jurisdiction finding that "[t]he source of the right that NYCPS seeks to vindicate is not rooted in contract" because "NYCPS does not seek relief based on a violation of the grants' terms. Nor does it seek the restoration of any terminated grant. . . . Instead, NYCPS is only seeking that the non-continuation decision be vacated with no guarantee that any money will ultimately flow. And, in support of that request, it cites alleged violations of the APA without relying on the grant agreements." April 8 Order at 4. The same cannot be said here. As discussed above, Plaintiff claims entitlement to a specific funding amount—$2,999,999 for each grantee—based on their interpretation of GAN contractual provisions and asks the Court to strike down a term of those

same contracts—payment through the reimbursement process. Further, in *NYCPS I*, the Court acknowledged that it cannot order defendants to expend any funds and noted that the mere "possibility" that its order may result in the disbursement of funds does not deprive it of jurisdiction. *Id.* at 5 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). But here, in awarding relief to the Plaintiff, the Court would be ordering that additional funds be expended. The grants have been continued by ED. Awards have been issued. The only dispute is over the size of the award under the GANs.

Finally, in *NYCPS I*, the Court held that *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), "made clear that 'the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based'" and, accordingly, the Court was "bound to consider defendants' actions only within the bounds of Title IX." April 8 Order at 8; *see also DHS v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action") (internal citations and quotations omitted). That is not true here; in fact, the administrative record makes clear that ED did not rely upon Title IX in issuing the June 9 GANs. Bessette Decl. ¶ 8. As such, the Court is bound to consider the case within the confines of that administrative record, which reflects that the June 9 GANs were issued in accordance with the parties' grant provisions. Any dispute about the propriety of the June 9 GAN award therefore arises from contractual—not statutory—authority.

For these reasons, the Tucker Act precludes the Court from exercising jurisdiction, and the Complaint should be dismissed. In the alternative, this Court should transfer this action to the Court of Federal Claims. *See Hendrickson v. United States*, 791 F.3d 354, 363 (2d Cir. 2015)

(transferring case to Court of Federal Claims because the plaintiffs' claims fell within the ambit of the Tucker Act).

## II. This Court Does Not Have Jurisdiction Under 20 U.S.C. § 1683

Plaintiff attempts to create jurisdiction where none exists by citing to 20 U.S.C. § 1683. *NYCPS II* Compl. ¶ 117. Section 1683 only confers jurisdiction when two conditions are met: (1) the action is "not otherwise subject to judicial review," and (2) the complained of action was taken pursuant to Section 1682—Title IX. 20 U.S.C. § 1683. Both conditions are required for this Court to have jurisdiction, *id*., and neither are met here.

First, this action is subject to judicial review in the Court of Federal Claims. As relevant here, the Supreme Court in *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025), held that the Court of Federal Claims has "exclusive" jurisdiction over grant termination disputes, and that this jurisdiction cannot be evaded by trying to package the claim with an Administrative Procedure Act ("APA") challenge to agency guidance. *NIH*, 145 S. Ct. at 2661-62 (Barrett, *J.*, concurring). Accordingly, Section 1683 does not apply because this action is subject to review in the Court of Federal Claims. *See Fairfax Cnty. School Bd. v. McMahon*, 798 F. Supp. 3d 563, 568-69 (E.D.V.A. 2025) (*appeal docketed,* No. 25-2087 (4th Cir. Sept. 11, 2025), and *Arlington School Bd. v. McMahon*, No. 25-2107 (4th Cir. Sept. 16, 2025) (finding plaintiffs' reliance on 20 U.S.C. § 1683 to be "unavailing" as the Tucker Act provided for judicial review in the Court of Federal Claims).

But even if the Court found the Tucker Act did not apply, it would still lack jurisdiction because the complained of action was not taken pursuant to Section 1682—Title IX. As discussed *supra*, under *Chenery*, the Court is bound to consider the June 9 GANs based on the administrative record. April 8 Order at 8 (quoting *Chenery*, 318 U.S. at 87). Here, the administrative record is clear: ED did not consider Title IX when issuing the June 9 GANs. Bessette Decl. ¶ 8.

Further, Plaintiff concedes that Section 1683 only applies where a department or agency terminates or refuses to grant or continue assistance to a grantee. *NYCPS II* Compl. ¶ 117 ("Congress expressly declared that any action by a department or agency terminating financial assistance is subject to judicial review.") (citing 20 U.S.C. § 1683). And this interpretation is confirmed by a plain reading of the statute, which permits judicial review "[i]n the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682." 20 U.S.C. § 1683. But, here, there was no termination or refusal to grant or continue assistance to the grantees. Each grant was continued and awarded funds. Todd Decl. ¶¶ 4-7. While Plaintiff characterizes the grant awards as a "reduction," Pl.'s Br. at 9, that is not accurate. Plaintiff was never entitled to or guaranteed a specific amount of funding, and there was no reduction in grant award. *See* USDOE002622-USDOE002623; USDOE002745-USDOE002746; USDOE002992-USDOE002993; USDOE002858-USDOE002859; and USDOE002920-USDOE002921 ("The Secretary anticipates future funding for this award according to the schedule identified in Block 6 [$2,999,999]. These figures are estimates only and do not bind the Secretary to funding the award for these periods or for the specific amounts shown."). Moreover, the complained of reimbursement payment method does not prohibit access to funds, Todd Decl. ¶ 9, and likewise cannot be characterized as a termination or refusal to grant or continue assistance to the grantees. Accordingly, Section 1683 does not provide the Court with jurisdiction.

**III. In the Alternative, the Government Is Entitled to Summary Judgment**

While this Court lacks jurisdiction and should not rule on the merits for the reasons discussed *supra*, the Government is also entitled to summary judgment based on the administrative record.

### A. Defendants Observed All Procedures Required by Law When Issuing the June 9 GANs (Counts I and II)

The Court should grant summary judgment in favor of the Government on Counts I and II, which allege that, through the June 9 GANs, ED "reduced NYCPS's MSAP funding without observance of the required Title IX procedures" in violation of the APA, *NYCPS II* Compl. ¶ 119 (Count I), and failed to observe the requirements of the General Education Provisions Act ("GEPA") in imposing the reimbursement pay method, *id*. ¶¶ 121-127 (Count II). Plaintiff's argument is based on several mischaracterizations.

As to Count I, the Government submitted a declaration from acting Assistant Secretary Bessette confirming that ED did not consider alleged or actual civil rights violations or concerns, including Title IX concerns, in determining the June 9 funding amounts. Bessette Decl. ¶ 8. Under *Chenery*, this should be the end of the inquiry. April 8 Order at 8 (quoting *Chenery*, 318 U.S. at 87). ED cannot be found to have acted in violation of Title IX when it did not consider any alleged or actual civil rights violations or concerns in issuing the June 9 GANs. Title IX is not implicated.

Further, as discussed above, the grantees were never guaranteed any funding amount, and accordingly there was no "reduction" in funding. Plaintiff's "reduction" mischaracterization is more than a nomenclature dispute as Title IX applies only to the termination or refusal to grant or continue financial assistance in order to enforce Title IX compliance, 20 U.S.C. § 1683—none of which occurred here, Todd Decl. ¶¶ 4-7. The parties expressly agreed that the $2,999,999 figure stated in the initial GANs were "estimates only and do not bind the Secretary to funding the award for these or for the specific amounts shown." *See* USDOE002622-USDOE002623; USDOE002745-USDOE002746; USDOE002992-USDOE002993; USDOE002858-USDOE002859; and USDOE002920- USDOE002921.

In a further attempt to implicate Title IX, Plaintiff argues that ED did not issue funding for the entirety of FY 2026 and that its September 2025 non-continuation decision, which the Court held was based on Title IX, is the "but-for cause" of the "reduction" in funding. Pl.'s Br. at 12. Again, as discussed *supra*, ED did not reduce funding to the grantees. It is also inaccurate to claim that ED awarded funding for only a portion of FY 2026. The June 9 GANs identify the budget period as 10/1/2025 – 9/30/2026 (*i.e.*, FY 2026) and award funding for the entire budget period. *See, e.g.*, *NYCPS I*, ECF No. 113-6 at USDOE-Continuation_000784 (Boxes 6 and 7). For the same reason, it would not be correct to find, as Plaintiff suggests, that ED did not award any funds to Plaintiff for the first nine months of FY 2026. *See NYPCS II*, ECF No. 32 (Transcript of Conference Held on Aug. 27, 2026) at 2-3. ED made nearly $12 million in carryover funds available to the grantees for use during this period, which Plaintiff did not fully expend. Bessette Decl. ¶¶ 5-7.

Similarly, Plaintiff's attempt to tie the September 2025 non-continuation determination to a purported reduction in funding is misplaced. Pl.'s Br. at 12. In support, Plaintiff points to ED's reliance on the grantees' budgets, which were submitted in connection with the resolution of the preliminary injunction in *NYCPS I* and Plaintiff's resultant access to FY 2025 carryover funding. *Id*. At the TRO hearing, Plaintiff incorrectly characterized this as "zeroing out [its] budget." *NYPCS II*, ECF No. 32 at 4. But in determining the amount to award for FY 2026, ED was permitted by regulation incorporated into the contracts with the grantees to consider the amount of carryover funding available to each grantee in the fiscal year. *See* 34 C.F.R. § 75.253(e)(2)(ii) ("The Secretary may . . . [d]etermine the amount of new funds that the Department will make available for the subsequent budget period after considering the statement the grantee provides [describing how carryover funds will be used] and any other information available to the Secretary

about the use of funds under the grant."). That is precisely what ED did. Bessette Decl. ¶¶ 5-6. In connection with the Court's November 20, 2025 Consent Order, ED agreed to permit the grantees to use the FY 2025 carryover funds in FY 2026. *NYCPS I*, ECF No. 42 ¶ 1 (permitting Plaintiff to use "all Remaining Carryover Funds, for the period beginning October 1, 2025 and ending June 30, 2026, for any permissible expenses or obligations incurred under the grants up to and through June 30, 2026"). At the time, the grants were non-continued and the Secretary had denied Plaintiff's request for a no-cost extension. *Id*. at 2 (noting that ED issued GANs in September 2025 "with the consequence that NYCPS would not have access to the remaining non-expended funds awarded in, and carried over from, the previous budget year"). The parties' agreement permitted Plaintiff to access the funds and Plaintiff then submitted budgets "reflecting the current intended use of the Carryover Funds." *NYCPS I*, ECF No. 42 at 3. As a result, Plaintiff had access to significant carryover (nearly $12,000,000)—ranging from $1,467,172 to $3,184,293 for each grantee—and the budgets submitted by Plaintiff ran through June 30, 2026 (the end of the school year). *See NYCPS I*, ECF No. 113-6 at USDOE-Continuation_000767-USDOE-Continuation_000781. The amount of FY 2025 carryover was not impacted by the September 2025 non-continuation determination, and it was reasonable for ED, as a steward of the public fisc, to consider this significant carryover when awarding FY 2026 funding. It had nothing to do with Title IX. *See* Bessette Decl. ¶ 8.

Plaintiff likewise argues that placing the grantees on reimbursement pay status violates Title IX. Pl.'s Br. at 12-13. But Title IX is not implicated by reimbursement pay status, which has no impact on the continuation of the grants and does not prohibit access to grant funds. Todd Decl. ¶¶ 4-7, 9. It merely requires the grantees to spend their own funds first and then request reimbursement with appropriate documentation. *Id.* ¶ 9. Accordingly, reimbursement pay status

does not terminate or refuse to grant or continue financial assistance to the grantees under Title IX. *See* 20 U.S.C. § 1683.

As to Count II, Plaintiff argues that placing the grantees on reimbursement pay status violated 2 C.F.R. § 200.208 because ED purportedly failed to perform a four-factor analysis or provide notice to the grantees required by that provision. Pl.'s Br. at 13-14. But 2 C.F.R. § 200.208 was never adopted by ED, and its requirements do not apply. *See* 2 C.F.R. § 3474.1 ("The Department of Education adopts the Office of Management and Budget (OMB) Guidance in 2 CFR part 200, except for 2 CFR 200.102(a) and 2 CFR 200.207(a).").[15] Rather, ED clarified that it was authorized "in appropriate circumstances" to designate the specific conditions identified in Section 200.208—including reimbursement pay status, *see* 2 C.F.R. § 3474.10, and relies on the discretionary authority in 20 U.S.C. § 1226a-1 to do so. Accordingly, ED was not required to follow the procedures set forth in 2 CFR § 200.208.[16]

**B. The Agency's Actions Were Not Arbitrary and Capricious (Count III)**

ED acted reasonably in making nearly $15,000,000 available to Plaintiff during FY 2026. As reflected in the administrative record, ED determined the appropriate amount of funding for FY 2026 based on MSAP Annual Performance Reports submitted by Plaintiff, Plaintiff's 2025-26 school year budgets, the amount of FY 2025 carryover available to the grantees, and the

---

[15] Section 3471.1 was adopted by ED in December 2014. *See* 79 FR 76091. At the time, 2 C.F.R. § 200.208 was numbered as Section 2 C.F.R. § 200.207. *See* 2 C.F.R. § 200.207 (2014), *available at* https://www.govinfo.gov/content/pkg/CFR-2014-title2-vol1/pdf/CFR-2014-title2-vol1-sec200-207.pdf. Further, at the time, the analysis cited by Plaintiff in the current version of Section 200.208 did not exist except for a reference to "criteria" incorporated into Section 200.207(a). *Id.* The purported notification requirement—though outlined in Section 200.207(b)—was likewise incorporated by reference into Section 200.207(a). *Id.* ED is in the process of updating its regulations to reflect this numbering change. 91 FR 32198 (published May 29, 2026) at § 3474.3.

[16] While ED never adopted 2 C.F.R. § 200.208 and is not bound by it, the department has cited to it with the regard to the imposition of specific conditions unrelated to method of payment.

assumption that the grantees would use the maximum amount of expected funds during the period of FY 2026 not covered by Plaintiff's school year budgets. *See NYCPS I*, ECF No. 113-5 & 113-6. Funding determinations for future fiscal years have not yet been made, Bessette Decl. ¶ 9, and any concerns raised by NYCPS regarding operations outside of the current fiscal year—including the availability of carryover funding—are not relevant to determining the reasonableness of the June 9 GANs, which only cover FY 2026. *See, e.g.*, *NYCPS I*, ECF No. 113-6 at USDOE-Continuation_000784 (Boxes 6 and 7).

ED's June 9 funding determination resulted in NYCPS having access to $14,958,933 during the 2026 fiscal year. *See* Bessette Decl. ¶ 7 (sum of the figures found in the column entitled "Total amount of funds available for FY26"). A difference of approximately $40,000 or less than 1% from the requested amount—$14,999,995. *Id*. (sum of the figures found in the column entitled "Annual Requested & Estimated Average Award Amount"). Plaintiff's repeated assertion that it was required to operate on an "austerity budget" during the first nine months of FY 2026, *NYCPS II* Compl., ECF No. 1 ¶ 87, 92, 105, is belied by the fact that it had available nearly $12 million in grant funds and spent over $11 million. Bessette Decl. ¶¶ 5-6. In fact, Plaintiff had *millions* more in funds available to it in FY 2026 than it expended in either of the prior fiscal years.[17] *See*, *infra* at 7-8. Accordingly, the FY 2026 award was reasonable.

As discussed *supra*, Plaintiff's characterization of the June 9 grant awards as "reductions" in funding is inaccurate. The fact that Plaintiff may have anticipated a certain amount of funds and relied upon purported assurances or ED's past practices regarding the same, Pl.'s Br. at 15-16, is

[17] Indeed, the nearly $12,000,000 in carryover funding only existed because the grantees expended less in prior fiscal years than the requested and budgeted amount of $2,999,999 per grantee. *See infra* at 7-8. In other words, the grantees submitted budgets for more than they expended. *See* USDOE000398-406 (grantee budget justification submitted to ED); USDOE000866-875 (same); USDOE001434-43 (same); USDOE001993-2002 (same); USDOE002527-2536 (same).

immaterial because that anticipation and reliance is directly contradicted by the terms to which the grantees agreed in exchange for receiving the initial grant funding. *See* USDOE002622-USDOE002623; USDOE002745-USDOE002746; USDOE002992-USDOE002993; USDOE002858-USDOE002859; and USDOE002920- USDOE002921. As such, from the very beginning of the contractual relationship, Plaintiff was on notice that it should not develop reliance interests because future years' funding was not guaranteed. Moreover, as a matter of law, "a belief about how an agency is likely to exercise its . . . discretion is not a serious reliance interest." *FDA v. Wages & White Lion Invs. L.L.C.*, 604 U.S. 542, 585 (2025) (citation and internal quotation marks omitted).

Further, the methodology used by ED was not "unprecedented." Pl.'s Br. at 15-19. As explained above, to determine the FY 2026 award amounts, ED reviewed the amount of carryover available to the grantees (nearly $12,000,000), the budgets submitted for the 2025-26 school year, performance reviews (which included expenditures during the prior two fiscal years), and the May 2026 filing from Plaintiff identifying each grantee's remaining carryover funding given anticipated personnel costs and open encumbrances. Bessette Decl. ¶¶ 5-6. ED used this information to ascertain the approximate amount of carryover funds that would remain available to each grantee after June 30, 2026, and took this into consideration when issuing the FY 2026 awards. *See* Bessette Decl. ¶ 6. Specifically, ED rounded the $2,999,999 annual requested award amount to $3,000,000, prorated it for the three-month period not covered by the 2025-26 school year budgets and the nearly $12,000,000 in FY 2025 carryover funding already made available to the grantees, and subtracted the prorated amount by the amount of FY 2025 carryover funding anticipated to be remaining after June 30, 2026. *Id*. This approach is not "unprecedented"—ED has always been entitled to consider carryover funding and budget information in awarding funding. *See*

USDOE002622-USDOE002623; USDOE002745-USDOE002746; USDOE002992-USDOE002993; USDOE002858-USDOE002859; and USDOE002920-USDOE002921. (incorporating 34 C.F.R. § 75.253(e)(2)(ii) as a term and condition of the initial GANs).

This approach was also appropriate and reasonable. In fact, Plaintiff concedes that 34 C.F.R. § 75.253(e) permits ED to consider the availability of carryover funding in determining continuation award amounts and only takes issue with whether it was arbitrary for ED to do so here. Pl.'s Br. at 15. But it was reasonable for ED to set the FY 2026 awards by accounting for nearly $12,000,000 in funding already available to the grantees. It is well-established that agencies may consider current information and circumstances on remand, not just those that existed in the past. *See Chenery*, 332 U.S. at 201 ("After the remand was made . . . the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress."); *see also DHS*, 591 U.S. at 21 ("Alternatively, the agency can deal with the problem afresh by taking *new* agency action. An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.") (internal citations and quotation marks omitted) (emphasis in original). By June 9, the academic year was almost over, and Plaintiff had used nearly all of the $12,000,000 in carryover funding (made available and funded by ED) to operate during the school year ending on June 30, 2026. It was therefore reasonable for ED to determine the appropriate FY 2026 funding award based on an assumption that the grantees would use the maximum expected award amount for the period of the fiscal year not already covered by the carryover funding.

Further, to the extent Plaintiff seeks funding to replenish carryover funding—funding it previously received from ED—or to compensate for unspecified investments in programs, staffing, and infrastructure it made during the school year, Pl.'s Br. at 17-18, that is a request for money

damages—compensatory relief—which is not available under the APA. *See County of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010) (explaining that Section 702 of the APA does not waive sovereign immunity to seek money damages, which "refers to compensatory relief that functions as a substitute for lost property."). Any decisions about funding for future fiscal years will be made at a later date, Bessette Decl. ¶ 9, and are not relevant to an assessment of the reasonableness of the FY 2026 award.

Finally, ED's decision to place the grantees on reimbursement pay status was discretionary. Todd Decl. ¶ 8 (citing 20 U.S.C. § 1226a-1). While the APA provides a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Here, 20 U.S.C. § 1226a-1 provides that payments to grantees can be made "by way of reimbursement . . . as the Secretary may determine." 20 U.S.C. § 1226a-1. Accordingly, the statute does not provide any judicially manageable standard by which to adjudicate the agency's determination, and its determination cannot be second-guessed.

### C. No Further Notice and Comment Rulemaking Was Required (Count IV) and ED's Actions Were Not Contrary to Law (Count V)

Plaintiff argues that ED also erred by adopting a new interpretation of Title IX without engaging in required notice and comment rulemaking with respect to a June 5, 2025 internal policy memorandum, and that ED's alleged new interpretation is contrary to law. *NYCPS II* Compl. ¶¶ 149-163. As an initial matter, the agency has not taken any action in connection with the June 9

GANs premised on Title IX, let alone a new interpretation of it. *See* Bessette Decl. ¶ 8. Rather than relying upon documents in the administrative record, as it must, *see* April 8 Order at 8 (citing *Chenery*, 318 U.S. at 87), Plaintiff alleges that ED "adopt[ed] and act[ed] upon a new interpretation of Title IX" by issuing a June 5, 2025 memorandum from Acting Assistant Secretary Bessette, *NYCPS I*, ECF 109-2 (the "Policy Memo"). *NYCPS II* Compl. ¶ 153; *see also* Pl.'s Br. at 19-22. But ED did not consider this memo in reaching its determinations regarding the grants. *See NYCPS I*, ECF No. 113 (providing the certified administrative record on which ED relied in issuing the June 9 GANs, which does not include the memo). Indeed, the signatory of the memo—Assistant Secretary Bessette—has confirmed that civil rights considerations played no role in ED's June 9 funding determination. Bessette Decl. ¶ 8.

Notwithstanding the evidence in the record, Plaintiff claims that ED "necessarily relied on and implemented [the Policy Memo] when it required adherence to two 'gender ideology Executive Orders' as a condition in the June 9 GANs." Pl.'s Br. at 21. Plaintiff is mistaken. ED did not rely upon the Policy Memo because, unlike other grant programs, the MSAP statute and regulations already required the Assistant Secretary of Civil Rights to conduct a civil rights compliance review. *See* 20 U.S.C. § 7231(d) and 34 C.F.R. § 75.253(a)(3). Further, the Policy Memo is not mentioned in the June 9 GANs, which instead reference the Department of Justice's July 2025 "non-regulatory Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination." *See, e.g.*, *NYCPS I*, ECF No. 113-6 at USDOE-Continuation_000787. Accordingly, Plaintiff has not suffered an injury in fact that is causally connected to the Policy Memo and lacks standing to challenge it. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (holding that to have standing, plaintiff must establish that she suffered an injury in fact causally connected to the complained of conduct that will likely be redressed by a favorable

decision); *see also Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union Free School Dist.*, 478 F.3d 494,499-500 (2d Cir. 2007) (holding that plaintiffs did not have standing to challenge a board of education policy memo because any alleged harm was only a "theoretical possibility").

The same is true as to the executive orders cited by Plaintiff, *see NYCPS II* Compl. ¶¶ 96, 154, 160, 163. No action in connection with the June 9 GANs has been taken on the basis of the executive orders. Indeed, compliance with the executive orders is not a condition of the grants. *See, e.g.*, *NYCPS I*, ECF No. 113-6, at USDOE-Continuation_000787. Rather the grantees are required "not to use federal funds in this project in any manner that violates the United States Constitution" and federal law, including federal civil rights law. *Id*. The June 9 GANs merely note the existence of the executive orders (and the DOJ guidance), and flag that certain activities covered by the executive orders (and the DOJ guidance) "may" violate federal civil rights laws. *Id*. As such, Plaintiff has not suffered an injury in fact that is causally connected to the executive orders and lacks standing to challenge them. *See Lujan*, 504 U.S. at 560 (requiring plaintiff to establish harm that is "actual or imminent, not conjectural or hypothetical") (internal citation and quotation marks omitted); *see also Port Washington Teachers' Ass'n*, 478 F.3d at 499-500. Further, the application of the executive orders to Plaintiff is speculative and not ripe for adjudication. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that to establish Article III standing, a "threatened injury must be certainly impending . . . and allegations of possible future injury are not sufficient.") (internal quotation marks and alterations omitted). Accordingly, Counts IV and V of the Complaint should be dismissed.

Finally, Count IV fails for the independent reason that to the extent Plaintiff alleges that the Policy Memo sets forth a new interpretation of Title IX, Pl.'s Br. at 20, it is black-letter law

that "[i]nterpretive rules do not carry the force and effect of law, and they need not be promulgated pursuant to notice and comment procedures under the APA." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citing *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 95-97 (2015)). And "[b]ecause an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule." *Perez*, 575 U.S. at 101. As such, Plaintiff failed to allege "any changes to rules for which notice-and-comment rulemaking is required," *Tzumi Innovations LLC v. Regan*, 557 F. Supp. 3d 499, 509 (S.D.N.Y. 2021), and its claim should therefore be dismissed.

## IV. Plaintiff Has Failed to Establish the Factors Necessary to Obtain an Injunction

Plaintiff seeks injunctive relief to prevent ED from "freezing, terminating, reducing, or otherwise interfering with" Plaintiff's MSAP grant funding, or "imposing punitive or otherwise onerous terms or conditions" on that funding except as permitted by law. *See NYCPS II* Compl. Prayer for Relief (e)-(f).[18] In order to obtain a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Daniels v. Moores*, No. 24-30-PR, 2025 WL 883035, at *1 (2d Cir. Mar. 21, 2025) (summary order) (citations and internal quotations omitted). The third and fourth factors "'merge when the Government is the opposing party.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

---

[18] To the extent that the Court is inclined to vacate the June 9 GANs and order ED to issue new GANs, Defendants respectfully request 21 days to comply with any such order.

Plaintiff has failed to establish the factors necessary to obtain a permanent injunction. As discussed above, Plaintiff is not entitled to summary judgment and is therefore not entitled to any relief, let alone injunctive relief. Further, an injunction prohibiting ED from taking the challenged actions here (namely, considering the amount of carryover funding in making a subsequent funding determination and placing Plaintiff on reimbursement pay status) is in essence a request for specific performance barred by the Tucker Act. This is because Plaintiff's alleged entitlement to injunctive relief—the level of funding and on which terms—only stems from its contractual relationship with ED. *See Presidential Gardens Assocs.*, 175 F.3d at 143 (barring permanent injunction because plaintiff "in essence" requested specific performance of a contract). In addition, Plaintiff's alleged irreparable harm stems from a loss of funding, *see* Pl.'s Br. at 28, and therefore can be remedied through monetary relief in the appropriate forum—the Court of Federal Claims.

Finally, the equities and public interest weigh against issuing a permanent injunction. Plaintiff is seeking to hamstring the Government from lawfully effectuating discretionary decisions with respect to funding. There is no public interest in compelling federal agencies to make discretionary funding decisions. *See American Association of University Professors v. Dep't of Justice*, No. 25-cv-2429 (MKV), 2025 WL 1684817, at *14-15 (S.D.N.Y. Jun. 16, 2025) (rejecting plaintiffs' arguments regarding the public interest and equities because the court should not "direct the policies of the [Government] first and ask questions later"), *vacated as moot*, 175 F.4th 413 (2d Cir. 2026). As such, injunctive relief is not appropriate.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' cross-motion to dismiss or, in the alternative, for summary judgment pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 56, deny Plaintiff's motion for summary judgment, and deny Plaintiff's motion for a preliminary injunction, or alternatively transfer this action to the Court of Federal Claims.

Dated: New York, New York
September 4, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: */s/ Jeffrey Oestericher*
JEFFREY S. OESTERICHER
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2695

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil as modified by the Court's August 28, 2026 order, ECF No. 29. As measured by the word processing system used to prepare it, this memorandum contains 9,711 words.

*/s/ Jeffrey Oestericher*
Assistant United States Attorney